# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-CA-00023-COA

**J.T.S.**                                                                 **APPELLANT**

**v.**

**M.L.S.**                                                                   **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 12/11/2023 |
| TRIAL JUDGE: | HON. H. DAVID CLARK II |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CHANCERY COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | STEPHEN J. MAGGIO |
| ATTORNEYS FOR APPELLEE: | MARK A. CHINN |
| | JANEAH SAKALAUKUS KERR |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND RENDERED IN PART; REVERSED AND REMANDED IN PART - 12/16/2025 |
| MOTION FOR REHEARING FILED: | |

**BEFORE CARLTON, P.J., McDONALD AND WEDDLE, JJ.**

**McDONALD, J., FOR THE COURT**:

¶1.     The Harrison County Chancery Court granted JTS (wife) and MLS (husband) an irreconcilable differences divorce in 2015.[1]  The judgment incorporated the parties' "Child Custody and Property Settlement Agreement."  In 2022, JTS filed a petition for contempt against MLS for violating the court's judgment, raising numerous issues, including MLS's alleged failure to pay child support, failure to reimburse JTS for medical and educational expenses, and MLS's encumbrance of property in which JTS had been given an interest.

---

[1] The chancery court sealed the record, and the parties are referred to by their initials.

MLS countered with a petition to modify the divorce judgment. JTS then amended her complaint to add parties and seek damages resulting from MLS's alleged fraudulent conveyances of marital property to these parties. The chancellor bifurcated the claims of fraudulent conveyances from the contempt claims.

¶2. After a lengthy trial on the general contempt issues, the chancery court issued a final judgment finding MLS in contempt and granting JTS relief, including an award of attorney's fees. The court also modified the divorce judgment to lower the amount of life insurance coverage MLS was required to maintain. JTS appeals from the chancery court's opinion and judgment on the contempt issues, raising, inter alia, the inadequacy of the amount of interest charged on the arrearage MLS owed, the chancellor's limitations of her recovery of reimbursable expenses, and the low amount of attorney's fees awarded. Having reviewed the record, the arguments of counsel, and relevant precedent, we affirm in part, reverse and render in part, and reverse and remand in part.

### Facts and Procedural History

¶3. JTS and MLS were married on January 11, 1992, and finally separated in January 2015. They had five children, born in 1994, 1996, 1997, 2000, and 2003. On April 24, 2015, JTS filed a complaint for divorce on the ground of irreconcilable differences in the Harrison County Chancery Court.

¶4. While the divorce was pending, on May 8, 2015, the parties executed an agreement, referred to as the "Post Nuptial Agreement," concerning the temporary custody and support of their children and the temporary management of their property. Later, on October 16,

2

2015, the parties executed a "Child Custody and Property Settlement Agreement" (CCPSA), which often referred to the Post Nuptial Agreement and specifically stated:

> Any portion of the agreement of the parties executed on May 8, 2015 not modified herein will remain in full force and effect.

On October 19, 2015, the chancery court entered a judgment of divorce, which incorporated and ordered the provisions of the CCPSA.

¶5.    Both the Post Nuptial Agreement and the CCPSA were very detailed and provided for the children's custody, child support, medical insurance and expenses, and educational expenses.[2] The agreements also included provisions concerning the ownership of interests in certain business ventures, as well as the satisfaction and repayment of judgments and other obligations of the parties and the maintenance of a life insurance policy. The facts relevant to the issues on appeal will be discussed below as we cover each issue.

*JTS's Petition for Contempt and MLS's Motion for Modification*

¶6.    On October 5, 2022, JTS filed a petition for contempt against MLS, alleging that MLS had breached the parties' "settlement agreement" by failing to pay child support and make monthly payments on the money judgments JTS had been awarded. JTS sought compensatory damages as well as attorney's fees. On November 15, 2022, MLS answered the petition and moved to modify the divorce judgment regarding child support, life insurance, education expenses, and vehicle insurance provisions of the CCPSA.

---

[2] At the time of the divorce, MLS was employed by a bank, earning $110,000 per year. He also earned $18,000 per year as a partner in NorthCourt One LLC, and had additional income from other sources that were not identified in the record. At that time, JTS held an elective office.

¶7.   In 2022 and 2023, the parties engaged in discovery, and JTS pursued garnishments on several banks where MLS or businesses he had an interest in maintained accounts. Pursuant to the CCPSA, JTS was awarded $263,365.79 in judgments against MLS.  This amount included $74,957 for reimbursement of a judgment obtained by an individual (J.B.) against MLS, which JTS paid; $183,455 for JTS's share of the equity ownership in NorthCourt One LLC; and $5,000 for JTS's share in the equity ownership of KLS, LLC.[3] The CCPSA set out the method for MLS's payment of these amounts, namely that MLS would pay $2,000 per month in child support for the remaining four minor children,[4] but as the children grew older and became emancipated, the child support amount reduced; however, the excess would be used to pay JTS on the total judgment amount.  So MLS's monthly payments remained at $2,000 until all the children were emancipated and continued thereafter until the judgments were paid.  When MLS failed to make payments as required, JTS attempted to garnish MLS's accounts and also filed motions for judgment-debtor examinations of him and others.

*Amended Petition for Contempt*

¶8.   On February 28, 2023, JTS moved to amend her contempt petition to add parties and claims.  The chancery court heard the motion on April 3, 2023, and granted it in part.  On April 6, 2023, JTS filed her amended complaint, naming as defendants MLS and his father and mother, individually, and as partners in a family limited partnership and family

---

[3]  At the time of the divorce, the parties engaged an appraiser, who independently valued the parties' equity ownership of the two LLCs to value JTS's share.

[4]  By October 2015, the eldest child was age twenty-one and emancipated.

foundation. The amended complaint also included as defendants the partnership and foundation themselves, and the two businesses in which MLS held an interest, KLS, and NorthCourt One. JTS contended that according to the Post Nuptial Agreement, MLS agreed not to sell or encumber these businesses without JTS's knowledge or agreement. JTS alleged that despite this provision, MLS gave his parents a lien on his interest in exchange for a $300,000 promissory note without JTS's consent or knowledge and further breached the Post Nuptial Agreement. JTS also alleged that in July 2022, MLS further encumbered his NorthCourt One interest with another $300,000 note to his parents, further diminishing JTS's future equity interest in that property. In addition, JTS alleged that MLS liquidated stock in Hancock Bank in which she held an interest, that he sold or liquidated his interests in his Bancorp South 401k, in his family's partnership, and in his family's foundation—all in violation of the Post Nuptial Agreement.

¶9. The amended complaint JTS filed contained eight substantive counts:

Count One: failure to pay child support
Count Two: failure to reimburse educational expenses
Count Three: embezzlement of educational funds
Count Four: failure to maintain a life insurance policy
Count Five: failure to repay judgments
Count Six: willful non-payment of judgments
Count Seven: contempt in encumbering ownership interest in NorthCourt One and KLS
Count Eight: fraudulent conveyances that JTS alleged were being brought under the Uniform Fraudulent Transfer Act as well as in violation of the settlement agreements.

Over the ensuing months, the parties engaged in extensive discovery, and the chancellor held several hearings on motions to compel and other matters.

5

¶10.    In March 2023, MLS offered $90,051,15 to JTS as partial satisfaction for the back child support owed. The offer was conditioned on JTS agreeing to this amount as a full and final settlement of claims for past due child support and health insurance premiums.  JTS disagreed with the amount, and the parties tried to resolve the issue with no success. Thereafter, JTS filed a "Motion for Instructions and/or Directions from the Court Re: Negotiation and Acceptance of Cashier's Check Tendered by MLS."  After a hearing, the court allowed JTS to accept and negotiate the check, which would not act as accord and satisfaction nor affect her right to seek any further amounts she claimed were owed.

¶11.    Prior to trial, MLS filed a motion for partial summary judgment on Count Seven of the amended complaint that alleged he was in contempt of the Post Nuptial Agreement for encumbering his interest in NorthCourt One.  After hearing arguments on the motion, the chancellor granted MLS's motion and dismissed Count Seven, finding that because the Post Nuptial Agreement had never been presented for approval to the court that granted the divorce, its terms were not enforceable by contempt proceedings.

*Order Setting Trial and Required Itemizations*

¶12.    On May 4, 2023, the chancellor signed an "Order Setting Trial," stating:

> All parties to this action have agreed that the trial of this matter should be bifurcated and have also agreed to set the matter for trial on August 14 and 15, 2023, and on October 18-20, 2023.  However, the parties have not agreed as to what issues will be tried on which date.

So the court set August 14-15 as the trial date for the unpaid child support, unpaid medical expenses, failure to pay life insurance premiums, unpaid school expenses, interest on child

support, and attorney's fees. The court further ordered that no later than June 5, 2023, JTS was to file with the court "a full and complete itemization of the above costs and expenses that she claims to be due any payment or reimbursement from the Defendant, which shall be in the form similar to that attached as Exhibit 'A'." MLS was ordered to respond to each of the items claimed for reimbursement by July 5, 2023. The court order further stated:

> All remaining issues, other than those specified in #1 above, including Plaintiff's allegations of fraudulent conveyance, fraud and damages, and Defendant's Petition for Modification shall be heard on October 18, 19, 20, 2023.

¶13. JTS sent her itemization of the costs and expenses for which she was seeking reimbursement in a fifty-six-page letter/summary sent to the chancellor on June 6, 2023. MLS filed his response on July 5, 2023, which he amended and filed on July 20, 2023. In his response, among other things, he contested the amounts that JTS had "estimated" such as the rent for a condo used by the children while attending college, and the children's allowance.

¶14. On August 17, 2023, MLS made an itemized offer of judgment. He proposed to pay a total of $108,961.92 with 2.19% interest, covering back child support and health insurance, college education expenses, medical expenses for one of the children not covered by insurance, tuition for another child, and back premiums owed on the life insurance policy. JTS did not accept the offer.

*Trial*

¶15. Trial on the contempt issues began on August 14, 2023, and continued on August 15, 2023. Because the parties did not complete the presentation of evidence on the issues, the

7

court set an additional day for testimony, September 22, 2023, but the trial lasted longer. Even though the only witnesses to testify were JTS and MLS, the trial of the contempt issues was not completed until the fourth day of trial, October 18, 2023. JTS presented her case-in-chief, followed by MLS's case in response, and then JTS's rebuttal. During her re-direct examination and her rebuttal presentation, the court would not allow JTS to enter exhibits to document the charges she had estimated (i.e., the children's bank statements showing $400 per month deposits for allowances). The chancellor stated that such evidence was not proper on rebuttal.

¶16. On October 10, 2023, JTS filed a motion to amend her previously submitted itemization of June 6, 2023 to add charges for a drug monitoring program one of their children needed. The June 6th itemization did not include these amounts. The court heard arguments on this motion on the last day scheduled for trial, October 19, 2023, which will be discussed below. The parties' attorneys also argued the attorney's fee request that JTS had submitted, as well as the amount of interest that should be added for each category of delinquency.

*Chancery Court Opinions*

¶17. On November 1, 2023, the court issued its rulings on claims of unpaid child support, unpaid medical expenses, failure to pay life insurance premiums, unpaid school expenses, interest on child support, and attorney's fees. The court also modified the divorce judgment concerning the face amount of the insurance policy MLS was required to maintain, reducing it from $1,000,000 to $400,000. Thereafter, the court issued an "Amended and Corrected

8

Opinion" on November 6, 2023, and a "Second Amended and Corrected Opinion" on November 17, 2023.

¶18. When issuing the second corrected opinion (dated November 17, 2023), the court also issued a "Final Judgment of Contempt and Modification," setting the amounts MLS owed on the various categories, including:

| | | |
|---|---|---|
| a. Past due child support | $ 7,737.88, plus interest thereon at the rate[5] | |
| b. Past due medical expenses | $ 11,640.29, plus interest thereon at the rate of 4% | |
| c. Past due educational expenses | $106,628.62, plus interest thereon at the rate of 4% | |
| d. Past due Life Insurance premiums | $ 4,492.30, plus interest thereon at the rate of 4% | |
| e. Interest on Judgment payments | $ 3,621.18 | |
| Total | $134,120.27 | |

The court found MLS to be in willful contempt for failing to pay the educational and medical expenses that he was presented, but the court found MLS not in contempt for those charges JTS did not give him. The order included the court's modification of the amount of life insurance MLS was required to maintain and advised MLS that he could purge himself of the contempt by paying JTS $134.120.27 within ninety days. The court also ordered MLS to pay JTS $10,000 as reasonable attorney's fees. There was no determination in the opinions or judgment that there was no just reason for delay or an expressed direction by the chancellor for the entry of a final judgment on these issues. *See* M.R.C.P. 54(b). Additionally, the judgment stated: "[A]ny other relief not specifically granted in the Court's Second Amended and Corrected Opinion of the Court and this Final Judgment of Contempt and Modification is hereby denied," which could have been interpreted as the chancellor's

---

[5] The judgment did not state the rate of interest for past due child support.

dismissal of JTS's remaining fraudulent conveyances claim.

¶19. On November 21, 2023, MLS delivered a cashier's check to JTS's attorney in the amount of $144,183.45 to satisfy the judgment.

*Post-Trial Motions*

¶20. On November 27, 2023, JTS filed a Rule 59 and Rule 60 motion to alter, amend, clarify, or grant relief from the November 17, 2023 Opinion and Final Judgment. *See* M.R.C.P. 59, 60. One issue she raised was that she had not been allowed to proceed with her fraudulent conveyances cause of action. On December 11, 2023, the court issued an order on JTS's motion, stating:

> Although it was initially anticipated that the trial of the first 6 issues noted above would require 2 days of testimony, the trial actually required 5 days of testimony and was not completed until October 19, 2023. The remaining issues noted in par. 5 above have yet to be set for trial.
>
> In its **Final Judgment of Contempt and Modification** the court made certain adjudications regarding the issues set for trial in August, 2023, as enumerated in par. 44 above. The provision in par 8 of the **Final Judgment of Contempt and Modification** to the effect that "any other relief not specifically granted in the Court's **Second Amended and Corrected Opinion of the** Court and this **Final Judgment of Contempt and Modification** is hereby denied" deal only with the issues enumerated in par. 44 above, those being the only issues before the court at this time. But as to those issues, the judgment is final.

(Emphasis added). The court ended by citing Mississippi Rule of Civil Procedure 54(b) in a footnote.

¶21. On December 11, 2023, the court issued an Amended Final Judgment that specified the interest rates on the arrearages owed:

a. Past due child support and medical insurance $ 7,737.88, plus interest thereon at the rate of 4% from due date of each monthly

| | |
|---|---|
| premiums | installment until paid |
| b. Past due medical expenses | $ 11, 640.29, plus interest thereon at the rate of 4% from date submitted to Mark for reimbursement until paid |
| c. Past due educational expenses | $106,628.62, plus interest thereon at the rate of 4% from date of judgment |
| d. Past due Life Insurance premiums | $ 4,492.30, plus interest thereon at the rate of 4% from due date of each unpaid premium until paid |
| e. Interest on Judgment payments | $ 3,621.18 as agreed by the parties, plus interest thereon at the rate of 4% from date of judgment |
| Total | $134,120.27 |

The amended judgment kept the same paragraph allowing MLS to purge himself of contempt by paying $134,120.27 within ninety days, and the judgment maintained the same amount of attorney's fees awarded, $10,000. The amended judgment also incorporated the court's second amended and corrected opinion findings concerning the life insurance policy, stating:

> In the opinion of the court, the total emancipation of 3 of the 5 children, coupled with the impending partial emancipations of [two others] in July 2024, constitutes a substantial and material change in circumstances of the parties sufficient to justify a reduction in the face value of the policy to $400,000 until the emancipation [of the youngest child]. Upon the total emancipation of [the youngest child], and in light of the fact that the parties have no "real estate interest" to be secured by the life insurance policy, the requirement that [MLS] maintain the policy shall cease and terminate.

*Clarification Order and Appeal*

¶22. On January 8, 2024, JTS appealed the chancellor's Second Amended and Corrected Opinion and Final Judgment, and several other interim orders that the chancellor issued.

11

Thereafter, on April 11, 2024, the court issued an order to clarify its Rule 59 order. In it, the court clearly stated that the issue of fraudulent conveyances was not presented to the court, and the court did not consider any evidence or testimony on it. The court further stated, "[P]ursuant to MRCP 54(b), the Court directs the entry of a final judgment as to those claims [tried], but not the remaining claims," and the court found "no just reason for the delay [of] entry of a final judgment as to those claims." The court indicated it would hold JTS's remaining claims in abeyance pending a ruling on the appeal.

¶23. On appeal, JTS raises the following issues:

(1) whether the chancellor erred in granting partial summary judgment and dismissing Count 7 of the Amended Complaint (i.e., whether the Post Nuptial Agreement that prohibited MLS from encumbering his interest in NorthCourt One was enforceable);[6]

(2) whether the chancellor erred in granting a partial judgment and dismissing Counts 5 and 6 of the Amended Complaint (i.e., whether MLS's failure to pay on judgments as set forth in the CCPSA entitled JTS to immediate collection of the entire amount and additional interest);

(3) whether the chancellor erred in granting MLS's motion for modification and reducing the amount of life insurance he was required to maintain;

(4) whether the chancellor erred in limiting medical bill reimbursement to only those presented within a year of payment;

(5) whether the chancellor erred in determining the rate of interest and the type of interest to be applied to past due child support obligations and/or to be applied to the past due property settlement payments;

(6) whether the chancellor erred in determining JTS was not entitled to

---

[6] Phrases in parentheses are clarifying language that we have added to JTS's statements of the issues.

12

recover one-half of a reasonable rent and/or utilities for the children's living in her condominium in Oxford; was not entitled to recover one-half of the allowances she had advanced to the children while attending college; and, whether the Court erred in limiting her cross examination of MLS, excluding testimony and records offered by her in support of her claims for same, or not allowing her to rebut MLS's denials of his being responsible for same;

(7)     whether the chancellor erred in allowing MLS credit against his child support arrearages for one-half of the insurance proceeds from a post-divorce property damage insurance claim for the loss of a vehicle purchased by the parties after the divorce;

(8)     whether the chancellor erred in excluding evidence offered by JTS in support of claims for additional expenses not listed previously her June 6, 2023, spreadsheet, in denying her claims for same, and in denying her motion to conform the proof;

(9)     whether the chancellor erred in his determination of attorney's fees; and

(10)    whether the chancellor erred: in overruling JTS's motion to exclude non-parties from attending the trial and/or hearings of this sealed matter; in entering a gag order preventing JTS from speaking with her adult children about the pending matter; in denying JTS's motion to strike those parts of the chancellor's opinion she suggested were improper and/or offensive; and, whether any of the chancellor's actions and demeanor were indicative of bias or improper decorum.

**Standard of Review**

¶24.    In matters relating to a divorce, when the parties execute a child custody and property settlement agreement that is incorporated into the divorce judgment, we review issues of law, including the interpretation of a property settlement agreement, de novo. *Powell v. Powell*, 411 So. 3d 1129, 1137-38 (¶32) (Miss. Ct. App. 2025). "A property settlement agreement that is incorporated into a divorce decree must be interpreted by courts as any other contract." *Id.* (citing *Siders v. Zickler*, 312 So. 3d 1224, 1228 (¶13) (Miss. Ct. App. 2021)). "When the

13

agreement's language is clear or unambiguous, we will enforce it as written," and if unclear, we will "harmonize the provisions in accord with the parties' apparent intent." *Id*.

## Discussion

### I. Whether the appellate court has jurisdiction over this appeal.

¶25. In this case, neither party challenged this Court's jurisdiction to consider this appeal. However, "[t]he Court must be mindful of its jurisdiction to act and, in the appropriate circumstance, raise the issue on its own motion." *McLeod v. Albanese*, 815 So. 2d 472, 474 (¶5) (Miss. Ct. App. 2002).

> Generally, only final judgments are appealable. A final, appealable, judgment is one that adjudicates the merits of the controversy, settles all issues as to all the parties, and requires no further action by the lower court.

*Williams v. Williams*, 415 So. 3d 1011, 1013 (¶6) (Miss. Ct. App. 2025).

> In *Montgomery v. Montgomery*, 281 So. 3d 171, 173 (¶7) (Miss. Ct. App. 2019), this Court explained that Mississippi Rule of Civil Procedure 54(b) provides one exception to the rule that only final judgments are appealable: "the [trial] court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an expressed determination that there is no just reason for delay and upon an expressed direction for the entry of the judgment." (Quoting M.R.C.P. 54(b)). The trial court's "expressed determination that there is no just reason for delay" must be stated "in a definite, unmistakable manner." *Id*.

*Id*. at (¶8).

¶26. In the case at hand, at the time of the appeal, neither the chancery court's Second Amended Corrected Opinion nor the Amended Final Judgment that accompanied it referred to Rule 54(b) of the Mississippi Rules of Civil Procedure, nor did either contain any language from which we could conclude that the judgment was final and appealable. In its order

14

concerning JTS's Rule 59 and Rule 60 motions to alter the opinion, the chancery court stated that the opinion and judgment dealt only with the issues tried and that "as to those issues, the judgment is final" and included a footnote, simply citing Rule 54(b). *After* the notice of appeal was filed, the chancery court entered another order that clarified its ruling on JTS's Rule 59 motion and specifically held, "[P]ursuant to MRCP 54(b), the Court directs the entry of a final judgment as to those claims [tried], but not the remaining claims," and the court found "no just reason for the delay [of] entry of a final judgment as to those claims [tried]." The court indicated it would hold JTS's remaining claims in abeyance pending a ruling on the appeal. As to the post-appeal clarification order, because we can discern from the language of the court's original Rule 59 motion order that the chancellor intended the Second Amended Corrected Opinion and Final Judgment on the contempt and modification issues to be final, we find that both rulings were appealable under Rule 54(b). However, the better practice would be to recite the Rule 54(b) language in the judgments and orders before the appeal is taken.

> II. **Whether the chancellor erred in granting MLS partial summary judgment and dismissing Count 7 of JTS's Amended Complaint (i.e., whether the Post Nuptial Agreement that prohibited MLS from encumbering his interest in NorthCourt One was enforceable).**

¶27. In her amended complaint, JTS alleged in Count 7 that MLS should be held in contempt for fraudulently encumbering his interest in NorthCourt One in violation of both the Post Nuptial Agreement and the CCPSA. The chancellor held that the Post Nuptial Agreement had not been reviewed by the court during the divorce proceedings, nor was it

attached to the divorce judgment. Thus, it was not enforceable, and MLS could not be found in contempt for encumbering his interest in the LLC. On appeal, JTS challenges this ruling.

¶28. The pertinent facts related to this issue are these. MLS, along with two partners, owned NorthCourt One. MLS and three others owned another limited liability company, KLS. MLS's interests in these businesses were included in both the Post Nuptial Agreement and the CCPSA.

¶29. In the May 8, 2015 Post Nuptial Agreement, the parties agreed that JTS was entitled to half of MLS's one-third ownership interest in the NorthCourt One LLC and had a contingent future interest in all of MLS's share in the LLC. They further agreed, "It is the parties' further intention that JTS and MLS would not sell, transfer or encumber said ownership interest without the agreement of the other." In the Post Nuptial Agreement, the parties stated that they intended that no third person would ever own their interest in the LLC, which they intended would ultimately belong to their children through inheritance.

¶30. The Post Nuptial Agreement dealt with MLS's interest in KLS differently. The provision concerning KLS stated that the parties agreed that JTS and MLS had equal shares in KLS, and "[i]n the event of divorce, the parties further agree that [JTS]'s one-half interest in the equity will be off set with some other award in property division, by Judgment, or by lien."

¶31. On September 15, 2015, without JTS's knowledge or consent, MLS pledged his interest in NorthCourt One to his parents in exchange for a $300,000 loan, as documented in a "Credit Line Promissory Note."

16

¶32.  Prior to the execution of the CCPSA in October 2015, the parties secured an independent appraisal of the real estate owned by NorthCourt One.  The appraisal valued it at $1,800,000.  The parties proceeded to execute the October 15, 2015 CCPSA with the section on NorthCourt One, providing:

> The parties acknowledge and agree, upon [MLS's] representation to [JTS] the assets held by NORTHCOURT ONE, LLC consist of certain real estate valued at $1,800,000.00 by Allen Purvis, Mississippi Certified General Appraiser, on September 24, 2015; [MLS]'s equity ownership interest in and to NORTHCOURT ONE, LLC is one-third (1/3) of the total value or $600,000.00.  Also upon [MLS]'s representation, his portion of the indebtedness thereon is $233,089.00, leaving equity in his one-third interest valued at $366,911.00.  For and in consideration of the terms of this Agreement, in exchange for her waiver of any interest and relinquishment of all claims in and to NORTH COURT ONE, LLC, the parties agree [JTS]shall be and is hereby awarded one-half of [MLS]'s equity interest which is valued at $183,455 as a Judgment award representing a division of marital property. . . . . [MLS] shall pay this award unto [JTS] in accordance with the provisions set forth in Paragraph 11 herein but may elect at any time to satisfy the full amount via lump sum payment or payments.  However, the parties further agree, in the event of a sale of all or a portion of [MLS]'s ownership interests in and to NORTHCOURT ONE, LLC, [MLS] shall pay unto [JTS] up to one half of the proceeds of such sale in satisfaction of this Judgment award, but not to exceed the total remaining balance owed to [JTS] in satisfaction of  all Judgment awards granted to her herein.

Concerning MLS's interest in the KLS, LLC, the CCPSA provided:

> For and in consideration of the terms of this Agreement, the parties agree MLS's equity ownership interest in and to KLS, LLC is valued at $10,000.00.  For and in consideration of the terms of this agreement, in exchange for her waiver of any interest  and relinquishment  of all claims in and to KLS, LLC, the parties agree [JTS] shall be and is hereby awarded $5,000.00 as a judgment award representing a division of marital property. . . . [MLS] shall pay this award to [JTS] in accordance with the provisions set forth in Paragraph 11 herein but may elect at any time to satisfy the full amount via lump sum payment of payments.  However, the parties further agree, in the event of a sale of all or a portion of [MLS]'s ownership interests in and to KLS, LLC, [MLS] shall pay [JTS] up to one half of the proceeds of such sale in

17

satisfaction of this judgment, but not to exceed the total remaining balance owed to JTS in satisfaction of all Judgment awards granted to her herein.

¶33. After the divorce, on July 1, 2022, MLS executed another promissory note to his parents for another $300,000, pledging the remainder of his interest in NorthCourt One as collateral without JTS's knowledge or consent. JTS learned of these notes only after she filed the contempt petition in October 2022 during discovery, which led her to file the motion to amend the complaint.

¶34. In Count 7 of the amended complaint, JTS asserted that the Post Nuptial Agreement made her a joint owner of MLS's interest in the LLCs and that she would not have entered into the CCPSA concerning the judgments she was awarded for the two LLCs had she known of MLS's encumbrance and assignment of his interest in NorthCourt One. She alleged that MLS's encumbrances of the interests in the LLCs violated both the Post Nuptial Agreement and the CCPSA, for which he should be held in contempt. JTS asserted that MLS's interest in the LLCs secured MLS's payments to her for the judgment debts she had assumed, as well as for $31,000 she had paid to satisfy other obligations, such as the Hancock Bank line of credit. In addition to a finding of contempt, JTS sought compensatory damages of $500,000, punitive damages, and attorney's fees. However, the CCPSA mentions nothing about MLS's interest in the LLCs acting as a security for the judgments, and there was no contemporaneously created document reflecting that the parties had intended the LLCs to secure the judgments. Moreover, there was no testimony from the parties concerning the formation of the CCPSA or their intent concerning the various provisions contained in it.

¶35. On May 23, 2023, MLS moved for judgment on the pleadings on Count 7 and argued

18

that JTS's claim was time-barred under Rule 60 of the Mississippi Rules of Civil Procedure because she pled that she had been fraudulently induced to sign the CCPSA and was therefore attempting to set aside part of the divorce judgment. MLS argued that Rule 60 relief from a judgment on the basis of fraud must be sought within six months of the judgment.[7] Further, MLS contended that he could not be held in contempt for conduct occurring prior to the entry of the divorce, nor could he be held in contempt for violation of the Post Nuptial Agreement, which he asserted "did not survive the divorce." On August 1, 2023, the chancery court dismissed Count 7, finding that the Post Nuptial Agreement was not attached to the judgment of divorce, was not incorporated therein, and could not be enforced by way of contempt. On appeal, JTS argues that the CCPSA incorporated the Post Nuptial Agreement, which made the Post Nuptial Agreement enforceable by contempt.

¶36. The Mississippi Supreme Court has held:

> Settlement agreements entered into by divorcing spouses and judicially approved under our Irreconcilable Differences Divorce Act become a part of the decree and enforceable as such as though entered by the court following contested proceedings. When the Irreconcilable Differences Divorce Act has

---

[7] Rule 60(b)(1) of the Mississippi Rules of Civil Procedure provides:

**Mistakes; Inadvertence; Newly Discovered Evidence; Fraud, etc**. On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons:

> (b)(1) fraud, misrepresentation, or other misconduct of an adverse party;
> . . . .
> The motion shall be made within a reasonable time, and for reasons (1), (2) and (3) not more than six months after the judgment.

been complied with, the custody, support, alimony, and property settlement agreement becomes a part of the final decree for all intents and purposes.

*West v. West*, 891 So. 2d 203, 210 (¶12) (Miss. 2004) (citation and internal quotation marks omitted). In this case, the CCPSA was attached to the final judgment of divorce, which stated:

> the 'CHILD CUSTODY AND PROPERTY SETTLEMENT AGREEMENT attached hereto and incorporated herein by reference is hereby approved and ratified and the Court specifically finds that the same makes adequate and sufficient provision for the parties and same is hereby made the order and judgment of this Court as if reiterated and restated in full in the ordering portion of this Judgment.

The CCPSA, however, states several times that it incorporates any provision from the Post Nuptial Agreement that the CCPSA did not modify. In one of the introductory "whereas" paragraphs, CCPSA recites:

> The parties additionally entered into a separate Agreement on May 8, 2015 [Post Nuptial Agreement] during their separation also settling certain property and other rights and matters between them. Said Agreement. . . is fully incorporated herein by reference without the necessity of being attached hereto, as was also the agreement of the parties.

That paragraph further stated:

> Any portion of said [Post Nuptial] Agreement, which is not expressly modified herein shall remain in full force and effect and binding upon the parties. The parties agree that this Child Custody and Property Settlement Agreement as well as the aforementioned [Post Nuptial] Agreement executed on May 8, 2015, shall be fully binding and enforceable between the parties, their heirs and assigns from the moment of execution by the parties. That this Agreement and its incorporation is a contract between the parties and may also be enforced under Mississippi's contract law. This Agreement along with the aforementioned [Post Nuptial] Agreement executed on May 8, 2015 shall be made a part of the Final Judgment of Divorce and incorporated therein should a divorce result.

20

Notably, the last sentence in the last paragraph of the CCPSA reads, "Any portion of the Agreement of the parties executed on May 8, 2015 (the Post Nuptial Agreement) not modified herein shall remain in full force and effect."

¶37. The divorce decree states that the chancellor who granted the divorce approved and ratified the CCPSA and found it adequate. To make this finding, the chancery court must have reviewed the CCPSA. In its review, the court would have seen the provisions referencing and incorporating the prior Post Nuptial Agreement. Although there is nothing in the record to indicate that the divorcing court also reviewed the Post Nuptial Agreement, there is also nothing in the record to establish that it did not. "Generally, absent a record indicating otherwise, we assume that a chancery court's order was based on adequate evidence." *Weathers v. Guin*, 151 So. 3d 272, 276 (¶18) (Miss. Ct. App. 2014). Further, in its review of the CCPSA, the divorcing court would have seen the clear and unambiguous language of the parties' intent to include and bind themselves to any unmodified provisions of the Post Nuptial Agreement. Therefore, we disagree with the chancery court, and we presume that the divorcing court reviewed any and all materials necessary to find that the provisions of the parties' agreements were adequate, including the references to the Post Nuptial Agreement. We find that the chancellor erred in finding that the Post Nuptial Agreement was unenforceable by contempt. The Post Nuptial Agreement was incorporated into the CCPSA by reference and thereby, it was "attached" to the final judgment.

¶38. Contracts may incorporate the terms of other documents. The Supreme Court has held that "[p]roperty settlement agreements are contractual obligations." *West*, 891 So. 2d at 210

21

(¶13).[8] The provisions contained within a property settlement agreement must be interpreted by courts as any other contract. *In re Est. of Hodges*, 807 So. 2d 438, 445 (¶26) (Miss. 2002).

> The rules applicable to the construction of written contracts in general are to be applied in construing a postnuptial agreement. Such a contract must be considered as a whole, and from such examination the intent of the parties must be gathered. Such construction should be given the agreement, if possible, as will render all its clauses harmonious, so as to carry into effect the actual purpose and intent of the parties as derived therefrom.

*Roberts v. Roberts*, 381 So. 2d 1333, 1335 (Miss. 1980). In *Woodruff v. Thames*, 143 So. 3d 546, 554-55 (¶20) (Miss. 2014) (citing 17A C.J.S. *Contracts* § 402 (2011)), the Supreme Court explained general principles of contract interpretation, including the incorporation of other documents by reference. The Court stated:

> For an incorporation by reference to be effective, it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms. A reference to another document must be clear and unequivocal, and the terms of the incorporated document must be known or easily available to the parties. A document is considered incorporated by reference where the incorporating document specifically provides that it is subject to the incorporated one. However, a mere reference to another document is not sufficient to incorporate that other document into a contract; the writing to which reference is made must be described in such terms that its identity may be ascertained beyond reasonable doubt.

---

[8] "A property settlement agreement is no different from any other contract, and the mere fact that it is between a divorcing husband and wife, and incorporated in a divorce decree, does not change its character." *Day v. Day*, 28 So. 3d 672, 676 (¶12) (Miss. Ct. App. 2010) (quoting *East v. East*, 493 So. 2d 927, 931-32 (Miss. 1986)). "The Court applies a de novo standard of review to issues involving the interpretation of contracts." *R.K. Metals LLC v. E & E Co.*, 404 So. 3d 123, 125 (¶7) (Miss. 2025) (citing *Cherokee Ins. Co. v. Babin*, 37 So. 3d 45, 48 (¶8) (Miss. 2010)). In contract interpretation, we first look to the "four corners" of the agreement and review the actual language the parties used and when the language of the contract is clear or unambiguous, we must effectuate the parties' intent. *Pursue Energy Corp. v. Perkins*, 558 So. 2d 349, 352 (Miss. 1990). The "[i]ntent of the parties is crucial in contract interpretation." *Newell v. Hinton*, 556 So. 2d 1037, 1042 (Miss. 1990).

*Id.*

¶39.    In the case at hand, the wording of the CCPSA unambiguously reflects the intent of the parties to be bound by the provisions of the Post Nuptial Agreement unless modified. The references to the Post Nuptial Agreement were clear and unequivocal.  The parties knew the terms and provisions of the Post Nuptial Agreement whose identity could be ascertained beyond a reasonable doubt.  Accordingly, we find that the terms of the Post Nuptial Agreement that were not modified in the CCPSA were incorporated into the final decree and enforceable by contempt proceedings.[9]

¶40.    Next, we must determine if the CCPSA modified the provisions in the Post Nuptial Agreement concerning JTS's interests in the LLCs and MLS's obligation not to encumber his interest in them.

*NorthCourt One LLC*

---

[9]    The cases the chancery court cited during the hearing on MLS's motion for judgment on this issue, and relied upon by MLS on appeal, are distinguishable from the facts of this case.  In *Sullivan v. Pouncey*, 469 So. 2d 1233, 1234 (Miss. 1985), the Mississippi Supreme Court refused to enforce a side agreement concerning the possession of the house and payment of the house note because it contradicted the property settlement agreement the parties had submitted to the chancery court .  The Court stated, "It would be tantamount to defrauding the court for parties to present to the court a property settlement agreement, which is subsequently incorporated into the final decree, while actually intending to abide by a contradictory, private contract. This is clearly against public policy." *Id*.  In the case at hand, the Post Nuptial Agreement was not a contradictory, private contract.  It was referenced throughout the CCPSA, making the court aware of its existence as well as the parties' desire that its provisions be enforceable to the extent the provisions were not modified by the final CCPSA.

The other case cited by MLS, *Switzer v. Switzer*, 460 So. 2d 843 (Miss. 1984), is also not materially relevant.  The Supreme Court there did not deal with more than one agreement or an agreement incorporating the terms of another. *Id*. at 844-46. *Switzer* merely addressed how a property settlement agreement becomes enforceable in the first place. *Id*. at 846.

¶41. In the Post Nuptial Agreement, the parties agreed that JTS had a half interest in NorthCourt One. They also agreed that MLS could not encumber or sell that interest without JTS's knowledge and consent. In the CCPSA, however, the parties valued that interest and gave JTS a money judgment for her share in the amount $183,455 and established the payment method for that and other judgments. There was no provision in the CCPSA that prohibited MLS from encumbering his interest in the LLC, and there was only a single sentence regarding JTS's right in the future. That sentence provided that upon a sale of the interest in the LLC, the proceeds were to be used to pay off the judgment and any other judgments JTS held as a result of the CCPSA. It is apparent that the CCPSA modified the agreement between the parties concerning the NorthCourt One interest, and MLS was not subject to contempt for encumbering the property after the CCPSA was executed. While he may have been in contempt prior to October 15, 2015, when only the Post Nuptial Agreement was in place,[10] after the CCPSA was signed, MLS was no longer prohibited from encumbering the property and could not be held in contempt for doing so.

*KLS, LLC*

¶42. The CCPSA also modified the Post Nuptial Agreement concerning MLS's interest in KLS. Initially, the parties only established that they equally owned MLS's interest in KLS. There was no prohibition from MLS encumbering his interest in KLS. The Post Nuptial Agreement indicated that if the parties divorced, JTS's interest would be reduced to a judgment or otherwise offset in the division of the marital property. When they executed the

---

[10] When the chancery court tries and hears testimony on the fraudulent conveyances issue, the court may reconsider its ruling on this issue.

24

CCPSA, the parties did just that—they valued the interest in the LLC at $10,000 and gave JTS a judgment of $5,000. The agreement provided the payment method for that judgment as well, and the parties also agreed that should MLS sell the property, the proceeds should be used to satisfy the judgment and any of the other judgments JTS was awarded. There was no provision prohibiting MLS from encumbering the interest in the CCPSA either.

¶43. In summary, we find that the chancery court did not err in dismissing Count 7 of the amended petition for contempt, albeit for a different reason. Had the Post Nuptial Agreement provisions concerning ownership interests in the LLCs not been modified by the CCPSA, the Post Nuptial Agreement terms would have been enforceable, and MLS could have been found in contempt for encumbering his interest in NorthCourt One thereafter. However, the CCPSA reduced JTS's interest in the property to judgments and did not prohibit MLS from encumbering his interest in NorthCourt One or KLS in the future. Accordingly, MLS could not be found in contempt for the second encumbrance he made. However, when the chancery court tries and hears testimony on the fraudulent conveyances issue, the court may reconsider its ruling on this issue as to the first encumbrance MLS made.

> **III. Whether the chancellor erred in granting MLS a partial judgment on the pleadings as to Counts 5 and 6 of the Amended Complaint (i.e., whether MLS's failure to pay on judgments as set forth in the CCPSA entitled JTS to immediate collection of the entire amount and additional interest).**

¶44. In Count 5 of her amended complaint for contempt, JTS alleged that since August 2017, MLS had failed to make any payments on the $263,412 in judgments as the CCPSA required. She sought a judgment of $263,412 plus prejudgment interest of no less than

$83,016.45, additional interest, and attorney's fees. On May 16, 2023, JTS filed a motion for partial summary judgment on this issue. However, after hearing arguments on the motion in July 2023, the chancery court dismissed Count 5, finding that the provisions JTS relied upon in the CCPSA to accelerate the debt and garner additional interest did not begin until the youngest child reached the age of majority. JTS argues on appeal that such an interpretation of the CCPSA is inconsistent with other language in the agreement and leads to a ludicrous result.

¶45. In paragraphs 8, 9, and 10 of the CCPSA, the parties agreed that JTS was entitled to judgments totaling $263,412. Paragraph 11 of the CCPSA required MLS to make monthly payments on the judgments as follows:

> 11. ***PAYMENT SCHEDULE FOR JUDGMENT AWARDS***. For and in consideration of the terms of this Agreement, in the event [MLS]'s child support obligation addressed *infra* decreases below **$2,000.00** per month due to the emancipation of one or more of the minor children, [MLS] shall pay unto [JTS] an amount equal to the difference between **$2,000.00** and [MLS]'s then current child support obligation each month in satisfaction of the total amount still owing to [JTS] relating to the total Judgment awards agreed to herein. In such event, therefore, [MLS] shall be required to pay unto [JTS] no more than a total of **$2,000.00** per month (but may pay more at this[sic] election) representing a combination of his child support obligation and payment toward the total amount still owing on the Judgment awards. Upon cessation of his child support obligation altogether, the parties agree as follows:
>
> > A. [MLS] shall pay unto [JTS] monthly installments in the amount of **$2,000.00** toward the remaining balance of the Judgment awards, if any, owed to her until said Judgments awards are paid in full.
> >
> > B. Payments not otherwise specified shall be applied in the following order: (1) KLS, LLC; (2) NORTHCOURT ONE, LLC; and (3) past indebtedness satisfied to J.B.

26

C.	[MLS] may elect to pre-pay more than one monthly installment at any given time by delineating on the instrument of payment the period of payment.

D.	[MLS] may elect to satisfy the Judgment awards in full at any time.

E.	[MLS] may elect to pay any lump sum amount to be applied toward the entire principal balance of the Judgment award still owing or toward a series of monthly installments not exceeding twelve (12) month.

F.	Any lump sum payment in the amount of **$24,000** shall be considered pre-payment of twelve (12) monthly installments.

G.	It is the intention of the parties to limit [the] length of time [MLS] may pre-pay monthly installments to a twelve (12) month time period.  Therefore, in the event [MLS] pays a lump sum in an amount **exceeding $24,000.00**, such excess amount shall be applied toward the principal still owing and **$24,000.00** shall be treated as a pre-payment of twelve monthly installments.  Such **excess** shall not be treated as a pre-payment of monthly installments.

H.	Should [MLS] default on these payments, the deficient monthly amount shall accrue to [JTS] at a rate of 6% interest per annum.

I.	Should [MLS] default on these payments for a period of twelve (12) consecutive months, the entire remaining balance shall become due and owing at the rate of 6% per annum.  In such event, [JTS] shall be entitled to collect the entire amount due and owing by availing herself of any remedy to which she may be entitled in law or equity.

It was undisputed that MLS failed to make payments on these judgments as required by

Paragraph 11, and JTS contended that under subsection I, she was entitled to collect the

entire amount ($263,412) plus six percent interest. MLS argues that subsection I was only triggered if he remained delinquent after the youngest minor child reached the age of majority, which at the time of the hearing, she had not.

¶46. The key phrase in this provision on which the parties' dispute hinges is "*Upon cessation of his child support obligation altogether, the parties agree as follows:*" followed by subsections A through I. The chancery court held that subsections A-I are only triggered when the youngest child reaches the age of majority, i.e., when MLS's child support obligation ended. JTS argues that this phrase applies only to subsection A, namely that when the child support obligation ends, then MLS must pay her the full $2,000 towards the judgments. All other provisions, JTS argues, were in effect from the date of the execution of the CCPSA. JTS points out that obviously subsections C and D would apply at any time, i.e., MLS could elect to make an extra payment or satisfy the judgments at any time, and these subsections did not depend on the youngest child reaching the age of majority. However, the chancery court noted that although the subject matter of the various subsections could have been applicable prior to the emancipation of the last child, by "the specific verbiage used in this agreement," the provisions were "only applicable after the emancipation of the last child."

¶47. In *Colbert v. Colbert*, 403 So. 3d 729 (Miss. Ct. App. 2025), we explained process for contract interpretation, stating:

> Contract interpretation involves a two-step inquiry, where we first must determine whether a contract is ambiguous and, if not, enforce the contract as written. We use a de novo standard to review whether a contract is ambiguous. Second, in the event of an ambiguity, the subsequent interpretation

28

presents a question of fact for the fact-finder which we review under a substantial evidence/manifest error standard. If the terms of a contract are subject to more than one reasonable interpretation, their meaning presents a question of fact for the fact-finder.

*Id*. at 734 (¶¶21-22) (citations and quotation marks omitted). In the case at hand, the phrase at issue in paragraph 11 clearly and unambiguously precedes subsections A–I. Thus, the findings of the chancery court will not be disturbed unless we find substantial evidence to the contrary. We do not. The wording of the phrase, "*Upon cessation of his child support obligation altogether,*" identifies a specific time and a specific circumstance after which other conditions would become operative. When MLS is no longer burdened with child support payments subsections A–I clarify that he must still pay $2,000 per month to JTS on the judgments. The subsections also require him to pay interest on any missed payment, which had not been required when he was also paying child support. We find the contract terms in paragraph 11 were unambiguous, and the chancery court did not err in enforcing the contract as written and in refusing to enforce subsection I, which would accelerate the judgments and payment of interest until after the youngest child was emancipated.

**IV.** **Whether the chancellor erred in granting MLS's motion for modification of the amount of life insurance MLS was required to maintain.**

¶48. In the parties' 2015 CCPSA, MLS agreed to maintain a $1,000,000 life insurance policy naming JTS as the beneficiary. Specifically, the provision read:

> The parties acknowledge and agree they own a term only life insurance policy . . . on [MLS]'s life . . . with a face value of $1,000,000 with no cash value. For and in consideration of the terms of this Agreement, *due to the real estate interests and minor children,* the parties agree [MLS] shall maintain his present life insurance policy and continue to name [JTS] as beneficiary of

29

same. [MLS] shall not in any way unilaterally reduce the benefit therefrom without the consent of [JTS]. [MLS] shall not cancel said policy and shall not change the beneficiary designation, nor shall he take any action which could reduce the amount to be paid to the beneficiary in the event of his death. Should [MLS] violate this provision of this Agreement either intentionally or unintentionally, his estate shall be liable to [JTS] and her heirs for the full amount she would have received had the policy and the beneficiary designation been maintained in accordance with the provisions of this Agreement.

(Emphasis added). In response to JTS's contempt petition, MLS moved to modify his obligation to maintain this policy at such a high face amount because only one of the five children was still a minor and because any interest JTS had in real estate owned by the parties could be adequately protected with a lower amount of coverage. Despite JTS's opposition, the chancery court modified the CCPSA to require MLS to maintain only a $400,000 life insurance policy until the youngest child was emancipated, and thereafter, the court eliminated his requirement to maintain the policy altogether. JTS challenges this finding on appeal.

¶49.  Courts may order a party to maintain a life insurance policy to benefit either the spouse or the children. *See Layton v. Layton*, 181 So. 3d 275, 288 (¶42) (Miss. Ct. App. 2015) ("[A] spouse may be required to maintain life insurance in an amount sufficient to satisfy financial obligations, including alimony, that would survive his death."); *Gaskin v. Gaskin*, 304 So. 3d 641, 648 (¶17) (Miss. Ct. App. 2020) (concluding "the chancellor did not abuse his discretion in ordering [father] to maintain a $900,000 life insurance policy prior to his boys' emancipations"). However, the amount of insurance required cannot be excessive. For example, in *Coggins v. Coggins*, 132 So. 3d 636, 645 (¶38) (Miss. Ct. App.

2014), we held that requiring the former wife to be listed as a beneficiary to $175,000 in life insurance proceeds was excessive where the alimony payments were only $504 per month.[11]

¶50.    When the parties include a provision to maintain a life insurance policy in a property settlement agreement, questions often arise about when the obligation ends, if ever, and whether such provision can later be modified due to a change in circumstances. For example, in *Voulters v. Voulters*, 196 So. 3d 1019, 1027 (¶21) (Miss. Ct. App. 2015), we held that because the agreement did not expressly state when a life-insurance requirement would end, a husband, who was ordered to pay alimony of $1.08 million in installments of $10,000 each month, was still required to maintain a $1.08 million life insurance policy for the benefit of his ex-wife, even after he had completed paying the entire amount of alimony. On the other hand, if the life insurance secures child support payments, then such obligations may be subject to modification as children are emancipated. *See id*. at 1022 (¶¶4-5). An agreement for property division is binding on a court in the absence of fraud, duress, or unconscionability, while agreements with respect to alimony, custody and child support are subject to the court's review and modification. Deborah H. Bell, *Bell on Mississippi Family Law*, § 23.07 at 795 & n.79 (3d ed. 2020); *see also Woodfin v. Woodfin*, 26 So. 3d 389, 395 (¶29) (Miss. Ct. App. 2010) (concluding chancellor erred in modifying a couple's property settlement agreement with respect to marital debts and the husband's retirement funds without finding fraud, duress, or unconscionability).

_____

[11]    We note, however, that in *Coggins*, the chancery court determined the amount of insurance required. In the case at hand, MLS agreed in a property settlement agreement to maintain a $1,000,000 policy.

¶51. A life-insurance requirement provision, like other provisions of a property settlement agreement, "is governed by contract law and will be interpreted according to contract principles." *Talley v. Talley*, 366 So. 3d 901, 906 (¶8) (Miss. Ct. App. 2023).

> A true and genuine property settlement agreement is no different from any other contract, and the mere fact that it is between a divorcing husband and wife, and incorporated in a divorce decree, does not change its character. *East v. East*, 493 So. 2d 927, 931-32 (Miss. 1986). These agreements are "fixed and final, and may not be modified absent fraud or [a] contractual provision allowing modification," *Weathersby v. Weathersby*, 693 So. 2d 1348, 1352 (Miss. 1997), or where, because of a scrivener's error, the instrument does not reflect the actual agreement of the parties, *Ivison v. Ivison*, 762 So. 2d 329, 335-36 (¶21) (Miss. 2000). "[W]hen parties in a divorce proceeding have reached an agreement that a chancery court has approved, we will enforce it, absent fraud or overreaching, and we take a dim view of efforts to modify it just as we do when persons seek relief from improvident contracts." Id. at 334 (¶14) (citing *Bell v. Bell*, 572 So. 2d 841, 844 (Miss. 1990)).

*Talley*, 366 So. 3d at 906 (¶8).

¶52. Here, the CCPSA life insurance requirement provision read that MLS will maintain life insurance "due to the real estate interests and minor children." The provision specifically required that JTS be maintained as a separate beneficiary, which is reflected in the "Policy Details" exhibit entered into evidence, showing that both JTS and the children were named as beneficiaries. We note that JTS waived any alimony claim and that MLS's estate was made liable to JTS "and *her* heirs" for the full amount should MLS fail to maintain the policy. This language indicates that the insurance was intended to protect JTS's interests, including those interests related to real estate holdings of the parties, which would include the judgments JTS held related to them, as well as to insure adequate support for the children should MLS die. JTS testified that the parties intended for her interest, as well as those of

32

the children, be protected, stating:

> Our contract requires him to keep it in effect because of the real estate interests that were marital interests that he owed me, and because of the children. It lists both of these things. And so as I sit here today, I have still not been paid those real estate interests. And so this life insurance policy was *intended to secure all of our marital assets and our children, everything he owed me. That was the reason*. I mean, it has been this amount since 2002, when [MLS] purchased the policy.

Although the chancellor had the authority to modify MLS's child support obligations if the circumstances had changed, *see Brister v. Martin*, 413 So. 3d 636, 640 (¶16) (Miss. Ct. App. 2025) (holding a child support order may be modified with a showing of a material change in circumstances), here the life insurance policy secured MLS's obligations both to the children and to JTS, which continued after the children were emancipated.

¶53.    In this case, the chancellor calculated future support and expenses MLS owed for the remaining minor child and other child-related expenses. The chancellor calculated that MLS would still owe JTS $37,968, which included child support for the remaining minor child for $13,992; health insurance for two children, totaling $15,444; and health insurance for the youngest until the age of twenty-six, being $8,532. He found potential liability for education expenses totaling "around $60,000." He further valued JTS's "real estate interest" at $183,455, using only her interest in NorthCourt One as valued in 2015 and concluded that a $400,000 life insurance policy would adequately secure these obligations. However, in the CCPSA, the parties did not indicate that the $1 million policy limit was chosen to allocate a portion of the value to cover JTS's interests and another to cover those of the children, as did the chancellor. "The right of persons to contract is fundamental to our jurisprudence[,]

33

and absent mutual mistake, fraud and/or illegality, the courts do not have the authority to modify, add to, or subtract from the terms of a contract validly executed between two parties." *First Nat'l Bank of Vicksburg v. Caruthers*, 443 So. 2d 861, 864 (Miss. 1983).

¶54. When the parties listed both "the children" and "real estate interests" in the CCPSA, they were distinguishing JTS's interests from those of the children. "We acknowledge that divorce alone does not divest one of the right to receive life insurance proceeds under a former spouse's policy." *Martin v. Ealy*, 859 So. 2d 1034, 1037 (¶12) (Miss. Ct. App. 2003). In *Martin*, the husband had agreed to maintain a life insurance policy and not change the beneficiaries without the wife's consent. *Id.* at 1036 (¶4). When the minor child reached the age of majority and the wife had remarried, the husband let the policy lapse. *Id.* at (¶5). The chancellor found the husband in contempt and ordered the policy reinstated, *id.* at (¶6), and we agreed. We noted that the wife waived alimony and that the husband agreed to maintain the same life insurance policy that they had when they were married. *Id.* at 1038 (¶16). Both parties agreed to be bound by the agreement and signed it under oath, indicating they had resolved all claims. *Id.* at (¶17). We found no merit to the husband's claim that the wife's right to be maintained as a beneficiary had expired because she had remarried. *Id.* at (¶18). We said that the provision to maintain the insurance policy was not tied to alimony. *Id.*

¶55. In the case at hand, the maintenance of the insurance policy was not tied only to support for the children; it also secured JTS's real estate interests and judgments. Because of the dual nature of this provision, the life insurance obligation in the settlement agreement was not modifiable. MLS agreed to maintain the $1 million life insurance policy that he had

34

during the marriage. JTS waived any alimony claim, but she was awarded judgments on interests in businesses and real estate that MLS owned. Therefore, the chancellor erred in modifying the life insurance provision to reduce the amount of coverage required. In addition, the parties did not agree to a date for when the insurance requirement would end. Proof in the record established that MLS had not paid towards JTS's judgments though November 2023. Thus, it was unlikely that they would be paid by the time the youngest child was emancipated in 2024. Therefore, the chancellor was manifestly wrong in ruling that MLS's obligation to maintain the policy ended when the youngest child became emancipated, as this left JTS's real estate interests unprotected. We therefore reverse the chancery court's order modifying the life insurance provision of the CCPSA and, enforcing the contract as written, we render judgment requiring MLS to maintain the $1,000,000 life insurance policy as agreed.

**V.** **Whether the chancellor erred by limiting reimbursement of medical expenses to only those presented within one year of the date of payment.**

¶56. JTS argues that the chancellor erroneously limited the reimbursement of children's medical expenses to only those bills she presented to MLS within one year of payment. The relevant portion of the medical-expenses provision (paragraph 3) of the parties' CCPSA reads as follows:

> [MLS] and [JTS] shall each pay one half (½) of the deductibles and all reasonable medical expenses and all reasonable medical expenses and out of pocket medical expenses for the children which are NOT covered by insurance until the children reach the age of twenty-one (21). **The parties shall not be entitled to reimbursement from the other for such expenses for which they have paid but not sought reimbursement within one year of the date of**

35

**payment.**

(Emphasis added). This provision limited reimbursements for reasonable out-of-pocket medical expenses for the children only to those bills presented within the agreed-upon one-year period after payment. The chancery court held that this portion of the agreement was legally binding and barred JTS from reimbursement of medical bills that she did not present to MLS prior to December 2021 (the date she testified she presented them to MLS). JTS contests the court's holding and argues that the CCPSA improperly shortened the statutory limitations period for recoupment from three years to one year, noting that Mississippi Code Annotated section 15-1-5 (Rev. 2019) prohibits parties from contracting to change a statute of limitations.[12]

¶57. JTS relies on two general contract cases to support her position. One, *Pitts v. Watkins*, 905 So. 2d 553, 558 (¶18) (Miss. 2005), involved a contract to perform a home inspection that contained a clause requiring any lawsuit that might arise to be filed within one year. In finding the contract to be substantively unconscionable for many reasons, the Mississippi Supreme Court also noted that this provision was in direct contradiction to the three-year statute of limitations for contract actions in Mississippi Code Annotated section 15-1-49 (Rev. 2019). The Court stated, "This period of limitation cannot be changed by contract, and any such change in the limitations period shall be null and void." *Pitts*, 905 So. 2d at

---

[12] Section 15-1-5 provides:

The limitations prescribed in this chapter shall not be changed in any way whatsoever by contract between parties, and any change in such limitations made by any contracts stipulation whatsoever shall be absolutely null and void.

36

558(¶18). JTS also cites *Purvis v. Mar-Jac Poultry MS LLC,* 345 So. 3d 1223, 1225 (¶1) (Miss. Ct. App. 2022), where the parties' contract contained an arbitration provision requiring that the demand for arbitration be made within 120 days of any claim. *Id*. at 1228 (¶16). When a fire in one of Purvis's buildings killed Mar-Jac's roosters being used for breeding, *id*. at 1225 (¶3), and Mar-Jac sent a demand for arbitration, the issue of the timeliness of the demand arose. *Id*. at 1228 (¶16). When the case was appealed, we noted the three-year statute of limitation for contract actions, and stated, "To the extent the contractual 120-day notice period contained in the contract could be interpreted to limit the parties' right to bring a claim for relief, it was a violation of Mississippi Code Annotated section 15-1-5 and is void." *Id*. at 1229 (¶17) (emphasis added).

¶58.    We agree that parties to a contract cannot change the legislatively established limitations period for filing suit. But here, JTS and MLS were not changing such a statute of limitations; they merely agreed in the CCPSA to limit the amount that could be recovered in any action brought within the statute of limitations. Once approved by the court, the property settlement agreement became an enforceable court order, *Varner v. Varner*, 666 So. 2d 493, 497 (Miss. 1995), making an action for breach of that agreement not merely an action for breach of contract, but an action based on a violation of the court order. *Moseley v. Smith*, 180 So. 3d 667, 674 (¶29) (Miss. Ct. App. 2014). "[U]nder Mississippi Code Annotated section 15-1-43, all actions founded on any judgment or decree rendered by any court of record in this state []shall be brought within seven (7) years next after the rendition of such judgment or decree." *Id*. at (¶25); *see also Siders*, 312 So. 3d at 1231 (¶23). ("[A]

37

contempt action to enforce such [a property settlement] agreement is considered an action to enforce a judgment, and it is subject to the seven-year statute of limitations applicable to such actions."). Accordingly, in this case JTS had seven years to bring a contempt action for MLS's violation of the CCPSA, and nothing in the CCPSA limited that statute of limitations.

¶59. However, the parties can agree to limit the amount of damages they can recover, even in a timely filed breach-of-contract action. In *Henderson v. Blount*, 247 So. 3d 328, 332 (¶13) (Miss. Ct. App. 2018), we stated,

> Equity will enforce a contract for liquidated damages if such liquidated damages can be found to be reasonable and proper in the light of the circumstances of the case. *R.K. v. J.K.*, 946 So. 2d 764, 774 (¶23) (Miss. 2007) (citing *Maxey v. Glindmeyer*, 379 So. 2d 297, 301 (Miss. 1980)).

In the case at hand, the language in the parties' medical-expenses provision is clear that the parties agreed that neither would be entitled to reimbursement for medical expenses each has paid but not sought reimbursement from the other within one year of the date of payment. This provision does not affect or limit the children's right to medical treatment; it merely limits recovery of the cost of that treatment, a right held by JTS or MLS, to which they freely and voluntarily agreed. Accordingly, we find that the chancery court did not err in enforcing the clear, unambiguous language of the CCPSA and limiting reimbursable medical expenses to those presented within one year of the date of payment.

**VI.    Whether the chancellor erred in determining the rate of interest and the type of interest to be applied to past due child support obligations and/or to be applied to the past due property settlement payments.**

¶60.    As noted in paragraph 21 above, the chancellor awarded JTS 4% interest on back

38

child support owed, calculated from the date each monthly payment was due. The court

further awarded her 4% interest on the back judgment payments owed "from the date of the

judgment." JTS argues that although the chancery court had the discretion to set the interest

rate at 4% on the back child support, the court erred in awarding simple interest instead of

compound interest. She further contends that the interest on the contractual obligations (i.e.,

interest on judgments payments owed) should have been set at 8% compounded per

Mississippi Code Annotated section 75-17-1 (Rev. 2016).[13] MLS argues that the chancery

court did not err in setting the amount of interest owed.

### A.    Interest of Child Support Arrearage

¶61.    Interest on past due child support obligations is mandatory, and it accrues on each

payment from the date it became due. *See Brand v. Brand,* 482 So. 2d 236, 237 (Miss.

1986); *Caplinger v. Caplinger*, 108 So. 3d 992, 999 (¶25) (Miss. Ct. App. 2013). Pursuant

to Mississippi Code Annotated section 75-17-7, judgments in cases involving sales or

contracts bear the interest at the same rate as the contract evidencing the debt. But

> [a]ll other judgments or decrees shall bear interest *at a per annum rate set by the judge* hearing the complaint from a date determined by such judge to be fair but in no event prior to the filing of the complaint.

*Id*. (emphasis added). We have held that "[u]nder that section, it is error, as a matter of law,

---

[13] Mississippi Code Annotated section 75-17-1(1) sets the legal rates of interest for contracts at eight percent, providing:

> The legal rate of interest on all notes, accounts and *contracts* shall be eight percent (8%) per annum, calculated according to the actuarial method, but contracts may be made, in writing, for payment of a finance charge as otherwise provided by this section or as otherwise authorized by law.

for a chancellor not to award interest on a judgment for past-due support." *Oster v. Ratliff*, 205 So. 3d 1149, 1155 (¶22) (Miss. Ct. App. 2016). "Moreover, section 75-17-7 makes it clear that a judge should award interest at a per annum rate on judgments such as this one." *Id*.

¶62. However, even JTS agrees that the chancellor had the discretion to set the rate of interest in child support matters under this Code section. *Houck v. Ousterhout*, 861 So. 2d 1000, 1003 (¶15) (Miss. 2003). Mississippi courts have long held that interest accrues on unpaid child support payments from the date each payment becomes due. *Brand*, 482 So. 2d at 238.

> As to child support in particular, each monthly obligation that remains unpaid past its due date takes on the nature of a judgment that may not, in the ordinary course, be modified by the court thereafter. Included in this notion of finality is the proposition that each such unpaid installment begins to accrue interest at the legal rate, not from the time it may subsequently be formally reduced to judgment by a contempt or other appropriate enforcement proceeding, but from the time the obligation became due and owing and was not paid.

*Dorr v. Dorr*, 797 So. 2d 1008, 1015 (¶22) (Miss. Ct. App. 2001).

¶63. In the case at hand, the chancellor correctly followed these precedents and ordered that MLS pay "interest on back child support owed, calculated from the date each monthly payment was due." In *Fuhr v. Fuhr*, 818 So. 2d 1237, 1239 (¶8) (Miss. Ct. App. 2002), we explained the computation method that should be used. We stated:

> Child support payments made after a previously unpaid payment "should first be applied to aggregate interest at the legal rate accrued on such payments at the date of payment." Each payment made after the overdue payments due date has passed is to be used to extinguish the interest and then the principal on that overdue payment. Should any money remain it will then be applied to the next overdue payment and interest in order. Each unpaid month of child

40

support is viewed as its own little judgment against the responsible party. After the arrearage is calculated in this manner, an overall judgment shall be determined and accrue interest from the date it is entered. *Dorr*, 797 So. 2d at 1015 (¶22).

¶64. In this case, when the chancellor calculated the back child support owed, he apparently followed the method set in *Brand* and *Fuhr*, which would include a payment of interest for each missed payment. The chancellor, however, has the option of determining the type of interest that will accrue on the overall judgment of back support. We have affirmed courts that have awarded judgment on child support arrearages at rates of 8% per annum. *E.g.*, *Houck*, 861 So. 2d at 1003 (¶15); *see also Howard v. Howard*, 913 So. 2d 1030, 1036 (¶12) (Miss. Ct. App. 2005) (affirming chancellor's award of child support arrearage with eight percent per annum interest); *Beasnett v. Arledge*, 934 So. 2d 345, 349-50 (¶12) (Miss. Ct. App. 2006) ("The language in this statute [section 75-17-7] is fairly deferential to the trial court. We see no manifest error in the chancellor's application of eight percent per annum interest on the child support arrearage."). We also note that when a chancellor failed to award any interest at all, the Mississippi Supreme Court reversed and rendered a judgment with an interest rate of 8%. However, there is no requirement that 8% be awarded in such cases, and Section 75-17-7 clearly gives the chancellor discretion in setting the interest rate. Accordingly, we find no error by the chancellor in the case at hand in awarding 4% simple interest on the judgment against MLS for back child support owed.

        **B.**    *Interest Rate on Unpaid Payments on Judgments and Life Insurance Premiums*

¶65. In this case, the chancellor awarded JTS $4,492.30 in past due life insurance

premiums with an interest rate of 4% calculated from the due date of each unpaid premium until paid. The court also awarded her $3,621.18 for "interest on unpaid judgment payments as agreed by the parties" plus 4% interest on that amount from the date of the contempt judgment.[14] JTS argues that the chancellor erred in setting the 4% interest rate on these two amounts owed and argues that she is entitled to 8% interest.

¶66. We have held that an agreement like this CCPSA is a contract. *Wilson v. Wilson*, 53 So. 3d 865, 869 (¶13) (Miss. Ct. App. 2011); *see also In re Est. of Callender*, 309 So. 3d 131, 135 (¶13) (Miss. Ct. App. 2020) (stating that "a property settlement agreement is a binding contract between the parties"). We have even examined such agreements to determine if there were any contract defenses to their formation that may invalidate them. *Lindsay v. Lindsay*, 303 So. 3d 770, 784-87 (¶¶39-45) (Miss. Ct. App. 2020) ("After a thorough review of the record, we hold that Bruce was under duress when he signed the property settlement agreement, and therefore the contract is unenforceable and should be vacated and is hereby set aside.").

¶67. In this case, the CCPSA contract contained a provision in which JTS agreed to pay judgments that MLS owed ($263,365.79), and MLS agreed to pay her back in a particular manner. In another provision, MLS also agreed to maintain a life insurance policy.

---

[14] Payments on the judgments were required when the child support obligation dropped below $2,000 per month. In its November 1, 2023 opinion, the chancery court calculated the back payments MLS owed from July 2017 through July 2023 to be $33,543. However, MLS had paid this arrearage in July 2023 and filed a document confirming that he did so. In its amended opinion, the court acknowledged this filing and that the amount was paid. Thus, the only obligation concerning the back judgment payments was the amount of interest that had accrued on the unpaid payments from 2017 to 2023, which the parties apparently agreed was $3,621.18.

However, the CCPSA did not specify an interest rate to be applied to any judgment arising from a breach of these provisions, i.e., MLS's failure to make these payments.

¶68.    The post-judgment interest rate a court should set depends on the type of action in which it is rendering a judgment. Mississippi Code Annotated section 75-17-7 (Rev. 2016) provides:

> All judgments or decrees founded on any sale or contract shall bear interest at the same rate as the contract evidencing the debt on which the judgment or decree was rendered. All other judgments or decrees shall bear interest at a per annum rate set by the judge hearing the complaint from a date determined by such judge to be fair but in no event prior to the filing of the complaint.

These provisions create two classifications of judgments: judgments on contract actions, where the interest rate is set by the contract sued upon, and "all other judgments," where the court has discretion to set whatever rate it deems fair. In the second category, the court may award pre-judgment interest as well.

¶69.    Although courts considering contempt actions based on property settlement agreements have held that the agreement is a contract, as in *Wilson* and *Lindsay*, when assessing interest on child support arrearages, courts have held that a chancellor has discretion to set the interest rate, treating the judgment in the "all other judgments" category, even when a CCPSA is involved. For example, in *Brawdy v. Howell*, 841 So. 2d 1175, 1177 (¶2) (Miss. Ct. App. 2003), a contempt action for a party's failure to pay child support under a CCPSA, the chancellor awarded the back support owed plus 3% interest in light of the prevailing interest rate. *Id*. at 1178 (¶7). This interest rate was challenged on appeal, and we affirmed the chancery court's decision. *Id*. at 1180 (¶20). We cited section 75-17-7 as well

43

as a Mississippi Supreme Court decision affirming an 8% rate on past due child support payments. *Id*. (citing *Adams v. Adams*, 591 So. 2d 431, 436 (Miss.1991)). However, we stated, "We find no authority holding it an abuse of discretion or manifest error for the chancellor to set interest at a rate of three percent (3%) per annum." *Brawdy*, 841 So. 2d at 1180 (¶21); *see also Caplinger*, 108 So. 3d at 996 (¶25) (remanding a contempt action regarding failure to pay child support pursuant to a property settlement agreement because the chancellor failed to assess interest on the arrearage owed and requiring chancellor "to assess interest at a fair rate" under section 75-17-7); *Beasnett*, 934 So. 2d at 349-50 (¶12) (Because the language of the section 75-17-7 is deferential to the trial court, we found no manifest error in chancellor's application of 8% interest to child support arrearage).

¶70.    Recently, in *In re Est. of Brent*, 417 So. 3d 114, 116 (¶1) (Miss. 2025), the Mississippi Supreme Court considered the appeal of a probate claim brought by the estate of Brent's ex-wife for unpaid alimony owed under the property settlement agreement in their divorce and affirmed the court's discretion in setting the interest rate on alimony arrearages. There, Lea Brent and his wife, Ann, agreed in the property settlement agreement in their 1983 divorce that he would pay alimony of $5,600 per month until she remarried or died, as well as maintain a $500,000 life insurance policy that would be put in trust for Ann's benefit should he predecease her. *Id.* at (¶2). Ann never remarried and died in November 2015, and Lea died in 2021. *Id*. It was learned that from 2004 through 2015, Lea only paid $3,000 per month in alimony, *id.* at 117 (¶6), although prior to his death, he paid his Ann's estate the cash value of the policy, which was $75,143.28. *Id.* at 118 (¶11). Ann's estate filed a

44

probate claim in Lea's estate to recover the unpaid alimony, *id*. at 117 (¶5). After a hearing, the chancery court awarded the ex-wife's estate $139,104 and simple interest at the rate of 8% per annum. *Id*. at 118 (¶12). On appeal, among other issues, Lea's estate argued that the chancery court erred in awarding interest when the property settlement agreement did not provide for any interest. *Id*. at 124 (¶33). The Supreme Court held that there was clear precedent that alimony payments become vested as they become due and that each payment bears legal interest from and after its due date, citing *Rubisoff v. Rubisoff*, 242 Miss. 225, 133 So. 2d 534, 537 (1961). *Id*. The Court noted that even though the parties' property settlement agreement did not provide an interest rate, "the chancellor was *within his discretion* to defer to Section 75-17-1 and use an 8 percent interest rate." *Id*. at (¶34) (emphasis added). Thus, although the Supreme Court affirmed the use of the contract rate of interest because alimony was a provision of a contract, the decision still maintained the chancery court's discretion in the matter.

¶71. Keeping these precedents in mind and the fact that this is not a judgment rendered in a general breach-of-contract lawsuit but, rather, in a contempt action for the violation of a court-ordered CCPSA, we hold that the chancery court had the discretion under section 75-17-7 to set whatever amount of post judgment interest it found to be fair on the unpaid life insurance premiums and the unpaid judgment payment interest amount. The court could have set the rate at 8%, deferring to section 75-17-1, which sets the legal rate for contracts at 8%, as did the chancellor in *Brent*. But in the court's discretion, it was free to find that a lower rate was fair. Accordingly, we affirm the chancery court's assessment of the post-

judgment interest at 4% on both amounts.

**VII. Whether the chancellor erred in determining that JTS was not entitled to recover one-half of a reasonable rent and/or utilities for the children living in her condominium in Oxford or that JTS was not entitled to recover one-half of the allowances she had advanced to the children while attending college; and whether the court erred in limiting her cross-examination of MLS, excluding testimony and records offered by her in support of her claims, or not allowing her to rebut MLS's denials of his being responsible.**

*A.    Reimbursement for Children Living in the Oxford Condo*

¶72.    JTS and MLS agreed to share the undergraduate education expenses of their children, including housing. When the children reached college age, all but one attended the University of Mississippi in Oxford, where MLS and JTS owned a condominium. In the CCPSA, JTS was awarded the condo. She paid MLS $20,000 for his share of the equity in the property and assumed the outstanding indebtedness still owed. At various times, one or two of the children lived in the condo instead of in University housing, for which the parties would have had to pay. In her contempt action, JTS sought reimbursement from MLS for half of the costs of the children living in the condo, which she initially estimated at $660 per month ($600 for rent and $60 for utilities). In denying her any reimbursement, the chancellor held that JTS had not kept adequate records of the expenses as required and had estimated a $1,200 per month rental value for the condo with no independent basis to calculate a $600 per month reimbursement from MLS. Further, JTS had only estimated the utility expense at $60 per month and, in fact, had not incurred any additional expense for having the children live in the condo.

¶73.    Before we get to the adequacy of JTS's proof of the expenses, we must first

46

determine whether MLS had an obligation under the CCPSA to pay JTS for "housing" the children, who chose to stay at the condo when they attended college. Mississippi courts generally enforce agreements between parents regarding payment of college expenses, provided that the terms are clear and unambiguous. *Harmon v. Yarbrough*, 767 So. 2d 1069, 1071 (¶¶8-9) (Miss. Ct. App. 2000). Thus, we begin with the agreement of the parties, the CCPSA, where, in paragraph 29, the parties agreed to share education expenses for the children, stating:

> For and in consideration of the terms of this Agreement, beginning in the school year of 2015/2016, the parties agree each shall contribute to the education expenses of the children as they are financially able, but agree each shall be responsible for one half (½). *The parties shall keep accurate records of the education expenses incurred and expended by each of them (whether from their own resources or respective family resources) and shall provide the other with such records by the end of each school year. . . . Education expenses shall include, but not be limited to, housing, meal plans, tuition, dormitory fees, book fees and costs, fraternity dues, sorority dues, fraternity and sorority meal plans, and parking decals.*

(Emphasis added).

¶74.    In listing "education expenses," the CCPSA separated "housing" from "dormitory fees" and required the parties to share in the costs of both. The term "housing" was not defined, in which case "[w]e have stated many times that a contract should be construed as written and words should be given their ordinary and properly accepted meaning when they are unambiguous." *Reynolds v. Druetta*, 417 So. 2d 917, 918 (Miss. 1982) (citing *Miller v. Fowler*, 200 Miss. 776, 28 So. 2d 837, 838 (1947) ("In construing a written contract the words employed will be given their ordinary and popularly accepted meaning, in the absence of anything to show that they were used in a different sense.")). However, "[a]n ambiguous

47

word or phrase is one capable of more than one meaning when viewed objectively by a reasonably intelligent person." *Epperson v. SouthBank*, 93 So. 3d 10, 19 (¶25) (Miss. 2012) (quotation marks omitted). JTS proposes that a "housing" expense would mean the costs associated with providing any generic shelter and basic utilities. However, reading the term "housing" in context in the CCPSA, it could also mean the costs of off-campus rental housing as opposed to dormitory housing. Thus, the term "housing" as an education expense is susceptible to two reasonable meanings and is ambiguous.

¶75. There probably would be no dispute between the parties about the meaning of "housing" expenses if the issue were MLS's failure to pay his share of the cost of renting an apartment from a third party. But in this case, the off-campus housing "landlord" was not a third-party but, instead, JTS, and the CCPSA did not specify how the "housing" education expenses would be affected if the children went to the University of Mississippi and lived in JTS's condo instead of a dormitory or other off-campus housing.

¶76. During testimony on this issue, the chancery court noted that the children were not obligated to pay rent to JTS:

> When the children come home to stay on the weekend, they don't have to pay to stay in the parent's home. If the parent owns a home somewhere else and the children stay there, they don't have to pay to stay there. . . . There's no evidence anywhere that these children have ever been charged to reside in any rentals owned by either one of the parties.

The chancery court ultimately denied JTS reimbursement from MLS for the cost she calculated for housing the children at the condo, and stated in its findings:

> There was never any expense incurred by the children for the use of the . . . condo and [JTS] never incurred any expense from the use of the condo over

48

and above the expense she incurred if the condo sat vacant. The cost to JTS was the same either way.

Because the "housing" language was ambiguous, we examine the court's interpretation excluding housing in JTS's condo for an abuse of discretion. *Trustmark Nat'l Bank v. Enlightened Props. LLC*, 330 So. 3d 772, 777 (¶7) (Miss. Ct. App. 2021).

¶77. In considering JTS's arguments on appeal, we note that in the parties' division of marital property in the CCPSA, JTS was awarded the condo. She assumed the expenses and was entitled to any rental fees. However, she did not "rent" the condo to her children. Moreover, whether or not the condo was vacant, JTS would still have to pay the monthly mortgage. The only cost not incurred if it were vacant was the cost of utilities. Thus, other than paying utilities, JTS incurred no additional expenses when the children stayed there for college.

¶78. JTS argues that MLS benefitted from not having to pay dormitory fees, and was thus unjustly enriched if he were not required to reimburse her for the expenses of the condo. But JTS also benefited from not having to pay dormitory fees by having the children live in the condo. Thus, it was not MLS, but JTS, who would be unjustly enriched if the court had ordered MLS to pay her half of the mortgage payment, the full amount of which she had assumed under the CCPSA for ownership of the condo. In addition, we note that JTS never demanded reimbursement from MLS for the condo rent until after she filed her contempt action in 2022. Clearly, she did not provide MLS with this alleged education expense at the end of each school year, as required by the CCPSA.[15] JTS further admitted that she and

_____

[15] The Education provision stated, "The parties shall keep accurate records of the

49

MLS never discussed his paying half of what she estimated was a reasonable rent. Thus, we find that the chancellor did not abuse his discretion in determining that MLS had no obligation under the CCPSA to pay rent or utilities for their living in JTS's condo.

¶79. In addition, we note that JTS never filed any petition for contempt when MLS first failed to pay what she considered was a valid housing education expense. She never discussed the subject with him until the 2022 contempt proceeding. Furthermore, had she made such a demand and MLS refused, JTS could have sought to modify the divorce decree to clarify that her providing the condo was as a reimbursable education housing expense. Although not directly on point, we noted the need for modifications like this in *Manley v. Manley*, 378 So. 3d 390, 398 (¶21) (Miss. Ct. App. 2023), where we affirmed a chancellor's ruling not to give father credit off his child support obligation for rental payments the father made on his son's apartment while the son was attending college. The father, George, had reasoned that because the son moved out of the mother's house, the financial burden on the mother had diminished. *Id.* However, we noted:

> Contrary to George's belief, if George wished to pay his support obligation directly to their son while he was attending college away from home, George should have petitioned the court to modify the prior decree. *Artz* [*v. Norris*], 163 So. 3d [983,] 988 (¶14) [(Miss. Ct. App. 2015)]. "As our Supreme Court has stated, he who unilaterally modifies a court order does so at his own peril." *Carite* [*v. Carite*], 841 So. 2d [1148,] 1155 (¶16) [(Miss. Ct. App. 2002)] (quoting *Alexander v. Alexander*, 494 So. 2d 365, 367 (Miss. 1986)); *see also Crow* [*v. Crow*], 622 So. 2d [1226,] 1231 [(Miss. 1993)] ("No party obligated by a judicial decree to provide support for minor children may resort to self help and modify his or her obligation with impunity." (quoting *Cumberland v.*

---

education expenses incurred and expended by each of them (whether from their own resources or respective family resources) and *shall provide the other with such records by the end of each school year*." (Emphasis added).

50

*Cumberland*, 564 So. 2d 839, 847 (Miss. 1990))).

*Id*. Here, JTS allowed the children to live in the condo instead of university-provided housing. Had JTS demanded reimbursement from MLS and he refused, JTS could have sought a modification of the divorce decree to clarify any obligation. In summary, we find no error by the chancery court in holding that MLS was not required under the CCPSA to contribute towards the payment of JTS's condo expenses when the children stayed there for college.

### B.    Allowances

¶80.    JTS also sought reimbursement from MLS for half of the $100 per week ($400 per month) per child allowance she gave to the children who were in college to help offset transportation and gas costs, food costs, and other incidental expenses. JTS claims that this, too, was a reimbursable education expense. In her case-in-chief, JTS presented the June 6, 2023 spreadsheets as evidence where she listed $400 monthly payments as "estimates." On rebuttal, she tried to enter the children's bank statements that reflected these deposits, but the court held this to be improper rebuttal. The chancery court denied JTS's request that MLS be required to reimburse her for his share of these allowances, and on appeal, JTS argues the chancery court erred in excluding the records that would document her payments of these allowances to the children—records that had been provided to MLS in discovery to verify the June 6, 2023 "estimated payments." She further argues that "estimates" can be used to substantiate damages.

¶81.    Again, our analysis begins with the agreement of the parties as reflected in the CCPSA

to determine if they intended to include the payment of an allowance to the college-enrolled children as an education expense. As noted above, the CCPSA provided: *"Education expenses shall include, but not be limited to, housing, meal plans, tuition, dormitory fees, book fees and costs, fraternity dues, sorority dues, fraternity and sorority meal plans, and parking decals."* Notably, "allowances" for incidentals are specific education expenses, but the list begins with the phrase "but not limited to." This phrase is generally used to indicate that a list is illustrative rather than exhaustive. Although not inherently ambiguous, the phrase does create an uncertainty about the scope of the parties' obligations here. In such instances, the court must interpret the intent of the parties. For example, in *Henry v. Moore*, 9 So. 3d 1146 (Miss. Ct. App. 2008), the chancery court had to determine the meaning in a lease-to-purchase contract of the phrase "vendees (the Moores) would 'assume responsibility' for three buildings on the property." *Id*. at 1149 (¶3). When the seller, Henry, found the buildings in disrepair, he sought to revoke the agreement. *Id*. at 1150 (¶5). The trial court found the phrase was ambiguous and interpreted it to mean that Henry wanted no more responsibility for the buildings and that the Moores could repair them if they chose to, but they did not have to. *Id*. at 1151 (¶13). The chancellor ordered the agreement to be enforced (i.e., the court ordered the Moores to tender $15,000 to Henry and ordered Henry to quitclaim the property to the Moores by quitclaim deed). *Id*. at (¶14). Henry appealed, and on appeal, this Court agreed with the chancellor that the phrase was ambiguous, stating that "[t]he contractual ambiguity arises from the fact that it is unclear from the way the contract is written what the Moores have assumed the responsibility of doing." *Id*. at 1153-

54 (¶21). Similarly, in this case, it is unclear what the education obligations the phrase "but not limited to" refers to, and the chancery court had the discretion to determine if the phrase included an obligation to pay allowances to the children.

¶82. In this case, MLS testified that he and JTS never discussed paying the children an allowance, and JTS never requested reimbursement for allowances until after she filed the contempt action in 2022. JTS agreed with these facts. Under these circumstances, we hold that the chancery court did not abuse its discretion in determining that allowances were not included in the education expenses provision of the CCPSA and denied JTS's request for reimbursement of half of the allowances she had unilaterally decided to pay the children. Again, JTS could have sought to modify the agreement to have these expenses covered. But she did not, and MLS is not bound by any agreement or court order to pay them.

### C. Chancery Court's Refusal to Admit New Evidence on Rebuttal

¶83. The chancery court also denied JTS's request because she had initially estimated these "housing expenses" and later attempted to present evidence into the record to support the utility expenses in rebuttal.[16] She also sought to enter the children's bank account statements to prove her deposit of the allowances each month. The chancery court sustained MLS's objection to JTS's presentation of new evidence because she was on rebuttal instead of her case in chief. Although we note that the "admission or suppression of evidence is within the discretion of the trial judge and will not be reversed absent an abuse of that discretion," *Kerr*

---

[16] Although she attempted to enter into evidence her VISA credit card payments to the electric company, JTS never presented any documentary proof of the rental value of the condo or proof of the $600 she testified she charged to one of her children's roommates at the condo.

*v. Kerr*, 323 So. 3d 462, 470 (¶19) (Miss. 2021) (quoting *Bower v. Bower*, 758 So. 2d 405, 413 (Miss. 2000)), we need not address the chancery court's rulings concerning presentation of new evidence on rebuttal given our holdings that the chancery court did not err when it found that MLS had no obligation to contribute to the condo or allowance expenses, no matter what they were or when evidence about them was introduced.[17]

### VIII. Whether the chancellor erred in allowing MLS credit against his child support arrearages for one-half of the insurance proceeds from a post-divorce property damage insurance claim for the loss of a vehicle purchased by the parties after the divorce.

¶84. In March 2016, after the parties divorced, JTS and MLS purchased a Volkswagen for one of their children, MRS. They agreed MLS would pay the monthly $289.99 note, and rather than reimburse him for her half, JTS credited MLS $149.49 toward his share of the children's health insurance. MLS paid for all repairs and insurance on this vehicle. This agreement was separate from the CCPSA. In April 2022, the vehicle was totaled in an accident, and the insurance company sent MLS a check for $5,290.57. MLS deposited the check into the bank account the parties had set up for child support payments and emailed JTS to let her know of the insurance pay-off.

¶85. When JTS sued MLS for contempt, MLS sought a credit against his child support arrearage for his payment to JTS of his half of the insurance settlement payment. JTS opposed this credit, claiming that she had sold a vehicle as a down payment for the

---

[17] We do note, however, in *Powell v. Powell*, 411 So. 3d 1129, 1141 (¶¶57-58) (Miss. Ct. App. 2025), we held that the chancery court did not abuse its discretion when it would not allow a party to introduce canceled checks showing payment of medical bills on redirect.

Volkswagen purchase, and that when MLS deposited the insurance proceeds, he never mentioned or asked that it be considered as payment of past-due child support. The chancery court held that although JTS traded a vehicle she owned toward the purchase of the Volkswagen, there was never any agreement between the parties that she should be reimbursed for that vehicle. The parties each agreed to pay half of the cost of the vehicle, and thus, the court held each was entitled to half of the settlement proceeds. Because MLS had already deposited the full amount in the child support account, the court then determined that MLS would not be reimbursed for his half of the insurance proceeds, but instead, MLS would receive a credit towards his past due support.

¶86. On appeal, JTS argues that the chancery court erred in its ruling and that MLS should not be given credit against the child support arrearage for a voluntary payment he made that she claims was not support. She cites *Manley*, 378 So. 3d at 396-97 (¶17), where, in addition to previously cited payments a father made for rent for his child, the father, George, also argued that he should be given credit for amounts he paid for the children's vehicles, vehicle tags, and insurance. On appeal, we noted that "the amount of arrearage in child support is a question of fact and is subject to our limited standard of review." *Id*. at 397 (¶18). We stated that "the purchases of vehicles for their son and daughter were not ordered by the terms of the PSA but, instead, were both George's choice to purchase." *Id*. at 398 (¶20). But we ultimately held that "[w]hether or not these payments should be credited to [George] against his child support arrearage was a question left for the chancellor's discretion." *Id*. (citing *Wesson v. Wesson*, 818 So. 2d 1272, 1280 (¶21) (Miss. Ct. App. 2002)). We noted

55

that "Mississippi law permits a non-custodial parent to receive credit for having paid child support where, in fact, he paid the support directly to or for the benefit of the child, where to hold otherwise would unjustly enrich the mother." *Id*. at 397 (¶18).

¶87. "We will not reverse a chancellor's findings of fact or discretionary ruling unless the chancellor abused his discretion, committed a manifest or clear error, or applied the wrong legal standard." *Martin v. Martin*, 416 So. 3d 988, 993 (¶17) (Miss. Ct. App. 2025) (quoting *Townsend v. Townsend*, 859 So. 2d 370, 371-72 (¶7) (Miss. 2003)). In this case, there was no evidence in the record that the parties had agreed that MLS would reimburse JTS for the value of the vehicle she traded in when the Volkswagen was purchased. MLS points out that he was not claiming that all the monthly payments he made on the vehicle should be credited as support; he only wanted credit for half of the final insurance payoff. In other words, each was entitled to half, and MLS decided to spend his half as payment of child support by depositing it in the children's child support account. Under these facts, the chancery court did not abuse its discretion in crediting the payment toward MLS's child support arrearage.

### IX. Whether the chancellor erred in excluding evidence offered by JTS in support of claims for additional expenses not listed previously in her June 6, 2023 spreadsheet, in denying her claims for same, and in denying her motion to conform the proof.

¶88. JTS lists the above as an issue at the beginning of her brief, but she does not present a separate argument on it thereafter. The only motion to conform the proof to the evidence in the record deals with invoices for the cost of drug and alcohol monitoring for one of the children. The Court denied the motion because it was determined during argument that the invoices had been admitted into evidence. Because JTS presents no separate argument or

56

authorities to flesh out this issue further, we need not address it.

> Mississippi Rule of Appellate Procedure 28(a)(7) governs the argument section of appellate briefs, and states, "The argument shall contain the contentions of appellant with respect to the issues presented, and the reasons for those contentions, with citations to the authorities, statutes, and parts of the record relied on." The rule "does not simply require a party to mention authority; the authority must be used to develop the argument in a meaningful way." *Walker v. State*, 197 So. 3d 914, 919 (¶25) (Miss. Ct. App. 2016) (emphasis added) (quoting *Archer v. State*, 118 So. 3d 612, 621 (¶29) (Miss. Ct. App. 2012)). Arguments that do not comply with the rule are procedurally barred. *Hill v. State*, 215 So. 3d 518, 524 (¶10) (Miss. Ct. App. 2017).

*Reading v. Reading*, 350 So. 3d 1195, 1199 (¶19) (Miss. Ct. App. 2022). Because JTS has provided no argument or authorities of any error by the chancery court in denying her motion to conform the proof, we find this argument procedurally barred.

### X. Whether the chancellor erred in his determination of attorney's fees.

¶89. JTS challenges the chancellor's award of $10,000 in attorney's fees after two years of contentious litigation, in which she prevailed but which cost her $147,121.71 for representation. She contends that the chancellor abused his discretion in making such an arbitrary award and that the high cost of the proceedings was due to MLS's obstructive behavior.

¶90. "When a party is held in contempt for violating a valid judgment of the court, attorney's fees should be awarded to the party that has been forced to seek the court's enforcement of its own judgment." *Gussio v. Gussio*, 371 So. 3d 734, 755 (¶64) (Miss. Ct. App. 2023). Attorney's fees are awarded to make the successful party whole. *Riley v. Riley*, 196 So. 3d 1159, 1163 (¶19) (Miss. Ct. App. 2016). "Although chancellors are instructed

57

to apply the factors in *McKee v. McKee*, 418 So. 2d 764 (Miss. 1982), when granting or denying attorney's fees, this Court has held that "[e]stablishment of the *McKee* factors is not necessary for [a] contemnee to recover attorney's fees where the contemnor has willfully violated a lawful court order." *Vincent v. Rickman*, 167 So. 3d 245, 251 (¶22) (Miss. Ct. App. 2015) (citing *Howard v. Howard*, 968 So. 2d 961, 979 (¶48) (Miss. Ct. App. 2007)); *Mixon v. Mixon*, 724 So. 2d 956, 964 (¶29) (Miss. Ct. App. 1998).[18] In *Bowen v. Bowen*, 107 So. 3d 166, 127-73 (¶24) (Miss. Ct. App. 2012), a contempt case, we listed the *McKee* factors and then stated:

> With regard to contempt actions, Mississippi law is clear that "[w]here a party's intentional misconduct causes the opposing party to expend time and money needlessly, then attorney['s] fees and expenses should be awarded to the wronged party." *Mabus v. Mabus*, 910 So. 2d 486, 489 (¶8) (Miss. 2005) (quoting *State v. Blenden*, 748 So. 2d 77, 87 (¶33) (Miss. 1999)). However, even in contempt actions, "[t]he reasonableness of attorney's fees are controlled by the applicable [Rule] 1.5 factors and the *McKee* factors." *Mabus*, 910 So. 2d at 489 (¶10) (footnote omitted).

Mississippi Rule of Professional Conduct 1.5(a) lists the factors for determining a reasonable fee.[19] Moreover, the amount of fees assessed "must be fair and just to all concerned after it

---

[18] The *McKee* factors include relative financial ability of the parties, the skill and standing of the attorney employed, the nature of the case and novelty and difficulty of the questions at issue, as well as the degree of responsibility involved in the management of the cause, the time and labor required, the usual and customary charge in the community, and the preclusion of other employment by the attorney due to the acceptance of the case. *Creekmore v. Creekmore*, 651 So. 2d 513, 520 (Miss. 1995).

[19] This Rule provides:

A lawyer's fee shall be reasonable. The factors to be considered in determining the reasonableness of a fee include the following:
(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

has been determined that the legal work being compensated was reasonably required and necessary." *Bowen*, 107 So. 3d at 172 (¶23).

¶91.    In this case, JTS requested an award of attorney's fees in the amount of $147,121.17. She submitted an affidavit from her attorney, to which he attached sixty-one pages of billing records. Those records contained detailed entries describing the work he alone performed; no hours for paralegal or other staff were submitted. The court found that the attorney had excluded from these hours ones spent on motions dealing with other parties and the judgment debtor examination issue that was eventually abandoned. The court heard argument from the parties on the attorney's fee submission, during which MLS contended, among other things, that he was not in wilful contempt on any issue. After arguments, the court awarded JTS $10,000 in attorney's fees. The chancellor recognized JTS's entitlement to an attorney's fee given his finding that MLS's willful violations of the court's orders constituted contempt. The court proceeded to examine the seven *McKee* factors. Although the court noted that the first factor, the financial abilities of the parties, was not relevant under the law in assessing attorney's fees in contempt cases, the court noted MLS's financial condition and stated that JTS had not provided a Rule 8.05 financial statement. *See* UCCR 8.05. The chancellor

---

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
(3) the fee customarily charged in the locality for similar legal services;
(4) the amount involved and the results obtained;
(5) the time limitations imposed by the client or by the circumstances;
(6) the nature and length of the professional relationship with the client;
(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and
(8) whether the fee is fixed or contingent.

found JTS's attorney to be experienced and skillful, and found some aspects of the parties' contempt action, which are usually routine (i.e., including non-payment of support or medical expenses), to be novel (including several of the provisions of the CCPSA) or rendered difficult because of both parties' failure to follow directives in the agreement. The court recognized that JTS's attorney was solely responsible for her representation but was not precluded from taking on other cases. The court also found the attorney's hourly fee to be reasonable. However, the chancellor questioned the time and labor reflected in the attorney's sixty-two pages of billing submitted. After citing several entries reflecting the attorney's time in reviewing documentation and preparing spreadsheets, the court concluded:

> Because [JTS] failed, refused or neglected to provide bills, invoices, documents, records and receipts to [MLS] and to request reimbursement from him in a timely manner as defined in their agreement, it devolved to [her attorney] to review, organize and analyze those bills, invoices, documents, records and receipts, at $250.00 per hour. However, those are not functions which [JTS] should have request[ed] her attorney to perform. Those are functions she agreed in the CCPSA to perform, and to perform in a timely manner. Therefore, the court will not consider an award of attorneys fees against [MLS] for [JTS's attorney]'s performance of functions [JTS] should have performed years ago.

We find the chancellor's ruling and award to be manifestly in error for several reasons.

> ### A. CCPSA did not require JTS to maintain records in any certain way.

¶92. The chancellor's primary concern was the amount of time that JTS's attorney spent compiling the bills and invoices needed to establish the total amount MLS owed in several categories. The court states that this work was required because of JTS's own failure to follow the CCPSA directive to provide MLS with the bills and timely requests for

60

reimbursement. However, the CCPSA contains no requirement that JTS organize and compile a record of these bills. The court erroneously faulted JTS for something she was not required to do under the CCPSA and, in effect, punished her by drastically reducing the attorney's fee request. Moreover, even if JTS had provided timely reimbursement requests, her attorney would still need to review all the entries and amounts to ensure their accuracy, as well as JTS's entitlement to them. In addition, the court held that the length and cost of the litigation were due to *both* JTS's and MLS's failures—MLS's failure to pay and JTS's failure to request reimbursement. However, these are not factors to be considered in determining a reasonable attorney's fee when one party's willful contempt has been proved.

### B. The chancellor failed to articulate what charges were and were not compensable and why.

¶93. It appears that the chancellor's primary reason for reducing the attorney's fee request was his finding that the attorney was doing tasks that JTS should have done in terms of reviewing and organizing bills and invoices. However, an attorney is held to a higher standard than submitting to a court materials his client compiles without thoroughly reviewing them first. Moreover, in this case, the court actually set out in its order setting the trial dates, the format in which the court wanted the data to be submitted. This format required the parties to take whatever organization they previously had and redo it for presentation to the court. In its opinion, the chancery court lists sixteen entries of such work out of the hundreds of entries in the sixty-one pages of time records presented. The only other reason the court gives for the reduction in the fee award is a March 1, 2023 bill for thirty hours spent preparing the amended complaint, which we agree may be excessive. But

the chancellor does not indicate what a reasonable amount of time would be for such work or if he gave JTS credit for any of those hours at all. In our opinion, it is unreasonable, unfair, and manifestly wrong for the court to have so drastically reduced the attorney's award without more explicit findings, and we reverse and remand for the chancery court to make more specific findings to support any reduction in the attorney's fee request.

**XI. Whether any of the chancellor's actions and demeanor were indicative of bias or improper decorum.**

¶94. JTS contends that the chancellor's actions and written remarks were "rude, impertinent, condescending, biased," and not in keeping with the standards to which judges should adhere. She cites examples of this behavior and attitude, including exchanges between the court and her counsel when the court entered a gag order preventing the parties from speaking to their adult children about the case. JTS also takes offense at some remarks the chancellor made in his orders and his alleged denial of JTS's motion to strike those improper comments. In her Rule 59 motion to alter judgment, JTS brought the written comments to the court's attention. The chancellor addressed and explained them. For example, the chancellor said that his reference to Faye Dunaway portraying Joan Crawford in "Mommie Dearest" was to credit the origins of a phrase the court used, "[T]his is not her first rodeo," not to compare JTS to Faye Dunaway's acting in that role.

¶95. Despite JTS's references to the record to point out the alleged faults of the chancellor, she cites no legal authority to support her contention that the court's actions in this case constituted reversible bias. "Mississippi Rule of Appellate Procedure 28(a)(7) requires appellants to include 'argument on the contentions of appellant with respect to the issues

presented, and the reasons for those contentions, with citations to the authorities, statutes, and parts of the record relied on.'" *Rodriguez v. State*, 413 So. 3d 646, 657 (¶37) (Miss. Ct. App. 2025). More significantly, JTS never moved the chancellor to recuse himself, even though several of the instances occurred early in the proceedings. In *Robinson v. Burton*, 49 So. 3d 660, 665-66 (¶¶26-27) (Miss. Ct. App. 2010), this Court held that a party's failure to request the chancellor to recuse himself procedurally barred a challenge to the partiality of the chancellor on appeal. In *Robinson*, despite the procedural bar, we reviewed the record to determine whether any alleged bias error affected any of the appellant's substantive rights. *Id*. at 667 (¶28). "In conducting our review, we are mindful that the supreme court has clearly explained there is a presumption that the 'trial judge is qualified and unbiased, and this presumption may only be overcome by evidence which produces a reasonable doubt about the validity of the presumption.'" *Id*. (citing *Payton v. State*, 897 So. 2d 921, 943 (¶72) (Miss. 2003)). We looked to see "whether a reasonable person, knowing all the facts and circumstances, would harbor doubts about the trial judge's impartiality." *Id*.

¶96.    In the case at hand, JTS is also procedurally barred for failing to cite authority for her argument and failing to move the chancellor to recuse. *See* M.R.A.P. 28(a)(7). Notwithstanding those bars, we recognize that our federal and state constitutions require that our courts provide litigants a fair and impartial tribunal. *Schmidt v. Bermudez*, 5 So. 3d 1064, 1072 (¶11) (Miss. 2009). In that case, the chancellor accused the parties of committing perjury and lying to the court; he belittled and threatened them. *Id*. at 1066 (¶7). The court badgered Schmidt, pressuring her about what proof she had of possible abuse of her child.

*Id*. at 1067 (¶7). At one point, the court questioned the ex-wife about why she signed the parties' separation agreement, and stated, "You wanted out of a marriage to marry your sweetie and get out of dodge, that what it boiled down to." When she tried to explain further, the court stated: "Lady, lady, you get diarrhea of the mouth when I ask you a simple question. . . ." This is just a sample of the *Schmidt* court's behavior that the Mississippi Supreme Court found to be "wholly inconsistent with substantial justice" and evinced extreme bias and prejudice against Schmidt." *Id*. at 1074 (¶¶21-22). Unlike the trial judge in *Schmidt*, we find that the chancellor's conduct in this case was, for the most part, restrained and respectful. These proceedings were lengthy and often contentious; the trial lasted four days, in addition to several pre-trial motions hearings. The parties presented (and the court reviewed) thousands of pages of documents and exhibits. We have held that a chancellor may become irritated with a party, and

> the judge who presides at a trial may, upon completion of the evidence, be exceedingly ill disposed towards a party. . . . But the judge is not thereby recusable for bias or prejudice, since his knowledge and the opinion it produced were properly and necessarily acquired in the course of the proceedings, and are indeed sometimes (as in a bench trial) necessary to completion of the judge's task.

*May v. May*, 410 So. 3d 1087, 1095 (¶25) (Miss. Ct. App. 2025). In our opinion, notwithstanding the procedural bars, JTS has not shown that any ill disposition towards her by the court was such that a reasonable person, knowing all the circumstances, would have doubts about the chancellor's impartiality. Accordingly, we find no merit to this issue.

**Conclusion**

¶97. For the preceding reasons, we find no bias by the chancellor to warrant a reversal.

Further, we affirm the chancellor's rulings that JTS was not entitled to immediate collection of the unpaid judgments, that JTS could not recover medical expenses that were not presented to MLS within one year of payment, that JTS is not entitled to reimbursement for housing the children in the Oxford condo, and that she is not entitled to reimbursement for half of allowances she paid to the children. We further affirm the chancellor's ruling that MLS's share of the Volkswagen insurance payoff could be credited towards the child support arrearage, and the court was within its discretion in setting the 4% interest rate on the unpaid insurance premiums and interest on unpaid judgments.

¶98. We reverse the chancellor's ruling on the enforceability of the Post Nuptial Agreement. We also reverse the chancellor's modification of the CCPSA concerning the face amount and duration of the life insurance policy and render judgment that MLS must continue to maintain the $1,000,000 life insurance policy as agreed. Finally, we reverse the chancery court's ruling on attorney's fees and remand for the chancery court to make more specific findings supporting a reduction in the requested attorney's fees.

¶99. **AFFIRMED IN PART; REVERSED AND RENDERED IN PART; REVERSED AND REMANDED IN PART.**

**BARNES, C.J., CARLTON, P.J., WESTBROOKS, McCARTY, EMFINGER AND WEDDLE, JJ., CONCUR. WILSON, P.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. LAWRENCE AND LASSITTER ST. PÉ, JJ., NOT PARTICIPATING.**